ARENAS PROCESADAS, INC., demandante y recurrida, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO, demandado y recurrente.

*Número:* RE-89-485 *Resuelto:* 2 de febrero de 1993

594

*Jorge Pérez Díaz, Procurador General, Norma Cotti Cruz, Subprocuradora General, Nilda P. Fuentes Ortiz, Anabelle Rodríguez* y *Juan R. Deliz Román, Procuradores Generales Auxiliares,* abogados del recurrente; *Luis Berríos Amadeo* y *Harry R. Nadal Arcelay,* de *Cancio, Nadal & Rivera,* abogados de la recurrida.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

El Estado solicita la revisión de una sentencia del Tribunal Superior, Sala de San Juan, mediante la cual se determinó que la negativa por parte de la Administración de Reglamentos y Permisos (A.R.PE.) y del Departamento de Recursos Naturales de expedir los permisos administrativos para operar una planta de extracción de componentes de la corteza terrestre, en un área zonificada como Residencial de Baja Densidad, Distrito R-0, constituyó una incautación sin que mediara el pago de una justa compensación. Sostiene el Estado que tal denegación responde al ejercicio legítimo del poder de razón del Estado de conservar los recursos naturales del área de la Laguna Tortuguero y de poner en vigor la Sec. 19 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.

Las controversias suscitadas por este litigio requieren que tracemos cuál es la línea divisoria entre el poder de

razón del Estado (*police power*) y el de incautación de propiedad cuando el Estado pone en vigor un reglamento de zonificación para proteger un recurso natural de importancia en nuestro país. Al evaluar esta controversia recordemos el papel que juega la tierra en nuestro país:

Nuestro reducido espacio, junto a la situación precaria de nuestra economía, constituyen realidades que necesariamente pesan en la definición del ámbito de la acción gubernamental bajo el poder de razón de estado. La crisis de la tierra en Puerto Rico, unida a nuestras necesidades ambientales, ha forzado la creación de medidas innovadoras. *The Richards Group v. Junta de Planificación*, 108 D.P.R. 23, 40 (1978). Véase *E.L.A. v. Rodríguez*, 103 D.P.R. 636 (1975).

## I

De la sentencia parcial recurrida, las estipulaciones de hecho formalizadas por las partes y adoptadas por el tribunal, y la prueba documental sometida surge el historial del caso de autos siguiente.

El 22 de enero de 1976, Arenas Procesadas, Inc. (en adelante Arenas Procesadas) presentó en el Departamento de Recursos Naturales una solicitud de permiso de extracción de componentes de la corteza terrestre en un predio de terreno cerca de la Laguna Tortuguero.(¹) Simultáneamente, solicitaron a la Junta de Calidad Ambiental un permiso para la operación de una fuente de emisión e iniciaron las gestiones en las agencias estatales y federales para obtener las licencias correspondientes.

El 28 de abril de 1976 el Departamento de Recursos Naturales autorizó la extracción de mármol, arena y productos relacionados de la finca privada que para esa fecha era propiedad del Sr. Ramón Rodríguez Espino. El permiso

---

(¹) La solicitud fue presentada por Guayaney Products, Inc. Sin embargo, el 28 de septiembre de 1978 esta empresa presentó ante el Departamento de Estado una enmienda a su certificado de incorporación para cambiar su nombre a Arenas Procesadas, Inc.

tenía vigencia de un (1) año y era renovable, previa presentación de la información requerida. Además, expresamente se dispuso que la licencia no concedía un derecho adquirido y que tenía que ser renovada anualmente "bajo condiciones iguales o diferentes a las del permiso original".([2])

Como la finca estaba localizada en un distrito especial clasificado Residencial de Baja Densidad para uso agrícola o casas de una (1) o dos (2) familias (Distrito R-0) y la planta en cuestión se había establecido con anterioridad a la adopción del Reglamentgo de Zonificación, Arenas Procesadas solicitó de A.R.Pe. un permiso de uso no conforme legal para operar la cantera. Oportunamente, A.R.Pe. concedió este permiso condicionado a que no intensificase el uso y que cumpliese con los requerimientos del Departamento de Recursos Naturales, de la Junta de Calidad Ambiental y de otras agencias estatales y federales.

En marzo de 1977, Arenas Procesadas solicitó un permiso de construcción con el propósito de reubicar e instalar una nueva maquinaria y de esta manera ampliar sus operaciones. Ese mismo mes la empresa solicitó al Departamento de Recursos Naturales la renovación del permiso de extracción de componentes de la corteza terrestre que expiraba el 28 de abril de 1977. Para esa fecha la empresa no había iniciado sus operaciones y tampoco había cumplido con las condiciones impuestas por la Junta de Calidad Ambiental para controlar la contaminación atmosférica en la cantera.

Mientras dichas agencias consideraban estas solicitudes, el 31 de marzo de 1977 la empresa adquirió del Sr. Ramón Rodríguez Espino la finca *objeto del pleito*.

---

([2]) El permiso también tenía la cláusula siguiente: "Este permiso podrá ser revocado cuando se viole cualesquiera de sus cláusulas o cuando, a juicio del Secretario de Recursos Naturales, se cometiere alguna violación a la Ley Núm. 132 y su Reglamento, a la salud, seguridad del orden público o cuando varíen las condiciones existentes a la fecha de su expedición." Finalmente disponía que constituiría "causa suficiente para la revocación de este permiso cualquier daño significativo a la ecología del lugar …."

Posteriormente, el 4 de mayo de ese año, el Director Regional de A.R.Pe. expidió el permiso de construcción. Sin embargo, pocos días después, la Oficina Legal de A.R.Pe. envió un telegrama mediante el cual se le ordenó a Arenas Procesadas que paralizara de inmediato la construcción de la planta debido a que vecinos del sector y la Junta de Planificación se oponían a las nuevas instalaciones. Oportunamente, A.R.Pe. señaló unas vistas públicas e invitó a Arenas Procesadas y a todas las partes interesadas a exponer sus puntos de vista.

Por su parte, el 20 de mayo de 1977, el Departamento de Recursos Naturales le informó por escrito a Arenas Procesadas que su solicitud de renovación del permiso de extracción, que expiró en abril de ese año, estaba bajo estudio y le apercibió que durante dicho proceso evaluativo estaba prohibida la extracción o procesamiento de componentes de la corteza terrestre.

A principios de junio, A.R.Pe. celebró la vista administrativa y escuchó los testimonios, tanto de los representantes de Arenas Procesadas como de los vecinos que se oponían al permiso de construcción. También comparecieron los representantes del gobierno municipal de Manatí, la Junta de Planificación, la Junta de Calidad Ambiental y el Departamento de Recursos Naturales. Estas entidades gubernamentales se opusieron a la nueva planta, "ya que ésta afectaba grandemente a la Laguna Tortuguero, a los acuíferos que hay allí, a la fauna, pesca y a las aves que emigran a dicha laguna todos los años". Además, expresaron que "los acuíferos cercanos a la Laguna estaban siendo afectados debido a las explosiones de la Cantera, ya que se tapaban los túneles por donde pasan los acuíferos de agua dulce que entran a la Laguna". Informe sobre Audiencia Pública de A.R.P.E. de 2 de junio de 1977, pág. 5.

Después de evaluar estos testimonios y la prueba sometida, A.R.Pe. ratificó la paralización de las obras de construcción. La agencia concluyó que la finca estaba loca-

lizada en un área clasificada residencial (R-0) y que el mapa de zonificación no permitía la ampliación de las operaciones de la cantera. También se determinó que "[e]l cambio y operación del nuevo equipo para procesar los agregados, funcionando a su capacidad normal ... cae dentro de lo que se considera una intensificación del uso en el predio en cuestión". Informe sobre Audiencia Pública de A.R.P.E., *supra*, pág. 4. Finalmente, se le requirió a Arenas Procesadas que en un plazo de dos (2) meses obtuviera los endosos de otras agencias bajo apercibimiento de que su incumplimiento con estas condiciones conllevaría la revocación del permiso de construcción. *Arenas Procesadas no solicitó la reconsidedración ni apeló a la Junta de Apelaciones sobre Construcciones y Lotificaciones.* Por ende, *la determinación advino final y firme.*

De acuerdo con el dictamen de A.R.Pe., la empresa compareció ante el Departamento de Recursos Naturales, y con el propósito de obtener una renovación del permiso de extracción sometió una declaración de impacto ambiental del proyecto. Después de celebrar vistas públicas, el Departamento de Recursos Naturales también denegó el permiso de extracción debido al impacto negativo que tendrían las operaciones sobre el ambiente y el ecosistema de la Laguna Tortuguero. La empresa *tampoco recurrió en revisión de esta decisión al Tribunal Superior, por lo que la misma advino final y firme.*

Mientras las agencias concernidas evaluaban las solicitudes, el 1ro de noviembre de 1977 el entonces Gobernador, Hon. Carlos Romero Barceló, estableció un comité interagencial para formular la política pública sobre el desarrollo y la conservación del área de la Laguna de Tortuguero. Como resultado del informe de ese comité, en junio de 1978 el Gobernador designó el área de la Laguna Tortuguero como un recurso natural a conservarse. Posteriormente, la Junta de Planificación adoptó el Reglamento de Emergencia de la Cuenca Hidrográfica de la Laguna de Tortuguero

que entró en vigor el 5 de febrero de 1979. Arenas Procesadas no impugnó este reglamento. Tampoco solicitó un permiso de uso no conforme legal, una dispensa o una variación de los nuevos requisitos de zonificación del área.

Posteriormente, Arenas Procesadas hizo gestiones hasta encontrar un nuevo predio de terreno entre Dorado y Toa Alta. La empresa adquirió los terrenos y, previa consulta con el Departamento de Recursos Naturales y la Junta de Calidad Ambiental, trasladó sus operaciones y obtuvo los permisos correspondientes para construir y operar la cantera.

Cuatro (4) años después, en 1983, Arenas Procesadas presentó una acción civil contra el Estado Libre Asociado de Puerto Rico, el Departamento de Recursos Naturales, la Junta de Planificación, la Administración de Reglamentos y Permisos, y la Administración de Terrenos. En su acción sostuvo que la denegación de los permisos administrativos constituyó una incautación de propiedad sin el pago de una justa compensación en violación de las disposiciones de la Sec. 9 del Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, y la Emda. V de la Constitución de Estados Unidos, L.P.R.A., Tomo 1. Solicitó que se ordenara la expropiación de la finca en cuestión y el pago de $12,500,000 como justa compensación por el valor de la propiedad.

Luego, de varios incidentes procesales, el tribunal a quo fraccionó la causa de acción *en dos (2) fases* y procedió inicialmente a resolver si la actuación del Estado constituyó una incautación de la finca. En su sentencia el tribunal adoptó la estipulación de hechos sometida por las partes y determinó que la denegación de los permisos impidió "que la parte demandante utilizara los terrenos para los propósitos que los había adquirido". En su dictamen, el tribunal a quo concluyó que estas acciones gubernamentales disminuyeron el valor del terreno y constituyeron una incauta-

ción temporera de la propiedad sin el pago de una justa compensación.

Sin embargo, en cuanto a la expropiación a la inversa, el Tribunal Superior encontró que la acción había sido presentada prematuramente (antes de que transcurriera el término máximo de ocho (8) años que tenía el Estado para reservar un terreno para uso público). Véase Ley Núm. 2 de 29 de enero de 1979 (32 L.P.R.A. secs. 2921 y 2922). Como en el caso de autos el terreno fue ejecutado por el Banco Gubernamental de Fomento, el foro de instancia concluyó que Arenas Procesadas había perdido su causa de acción para requerir la expropiación a la inversa. No obstante, el tribunal a quo decidió continuar con la segunda fase del pleito para determinar los daños compensables por la privación temporera del predio en cuestión.

El Procurador General recurrió ante esta Curia y sostuvo que el Tribunal Superior se equivocó al concluir que el Estado se incautó temporeramente de los terrenos al denegarle a Arenas Procesadas los permisos para operar una planta de extracción de componentes de la corteza terrestre. También aduce que el tribunal a quo debió requerirle a los demandantes que agotaran los remedios administrativos disponibles antes de acudir a los tribunales.

La controversia del caso de autos se circunscribe a determinar si constituye una incautación temporera del Estado el que las agencias concernidas, en el ejercicio de su discreción y en el cumplimiento de su deber, denegaran los permisos solicitados por Arenas Procesadas para operar una cantera en terrenos de su propiedad. Este recurso nos permite examinar los últimos desarrollos en la jurisprudencia del Tribunal Supremo federal que establece el contenido mínimo de las garantías constitucionales en situaciones análogas. Véanse: *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 120 L.Ed.2d 798 (1992); *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470 (1987). Revocamos.

## II

En su solicitud, el Estado sostiene que sus actuaciones constituyeron un ejercicio válido del poder de razón del Estado en cumplimiento de "su deber de velar por la seguridad, salud y bienestar general ...". *Texaco Inc. v. Srio. de Obras Públicas*, 85 D.P.R. 712, 730 (1962). También aduce que, aunque en ciertos casos el ejercicio legítimo de este poder limita la utilización más económica de una propiedad, esto no constituye una incautación inconstitucional.

Al evaluar la controversia de autos, partimos de la premisa de que el Estado tiene un poder inherente para realizar actos que promuevan la salud, la seguridad y el bienestar de la comunidad mediante reglamentación razonable que limite el uso de una propiedad. Nuestra jurisprudencia claramente ha establecido que "el hecho de que en determinada ocasión su ejercicio legítimo haga imposible la utilización más económica de una propiedad, no lo hace inconstitucional ...". *Texaco Inc. v. Srio. de Obras Públicas,* supra, pág. 730. Su validez esencialmente depende de que proteja la salud, la seguridad, la moral y el bienestar general, y que la misma no sea irrazonable o caprichosa. *Vélez v. Srio. de Justicia*, 115 D.P.R. 533 (1984).

Por otro lado, en nuestro ordenamiento constitucional el Estado también tiene el poder del soberano de incautarse de propiedad privada siempre que sea para un fin público y pague una justa compensación. Art. II, Sec. 9, Const. E.L.A., L.P.R.A., Tomo 1; *E.L.A. v. Rosso*, 95 D.P.R. 501, 536 (1967). La obligación de pagar justa compensación "también cobra vigencia cuando éste lleva a cabo una 'incautación de hecho' al afectar de forma sustancial el uso físico de la propiedad o por medio de su reglamentación". *Culebra Enterprises Corp. v. E.L.A.*, 127 D.P.R. 943, 952–953 (1991).

■ Sin embargo, en los casos de reglamentación no existe una fórmula que demarque la separación entre el poder de razón de estado y el de expropiación. Por ende, nunca se ha precisado cuándo la reglamentación estatal alcanza tal magnitud que el poder de razón del Estado se convierte en el de expropiación forzosa. *Lucas v. South Carolina Coastal Council*, supra, pág. 812; *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340 (1986); *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978). Véase Epstein, *Takings: Descent and Resurrection*, 1987 Sup. Ct. Rev. 1.

■ No obstante, "la regla general ... es que aunque una propiedad puede ser reglamentada hasta cierto punto, si el reglamento excede unos límites, se considerará que hubo una incautación". (Traducción nuestra.) *Pennsylvania Coal v. Mahon*, 260 U.S. 393, 415. Tanto en Estados Unidos como en Puerto Rico, esta determinación generalmente se hace caso a caso, sopesando los distintos valores involucrados para obtener un equilibrio dinámico y razonable entre los intereses particulares y los de la comunidad. *Yee v. City of Escondido*, 118 L.Ed.2d 153 (1992); *The Richards Group v. Junta de Planificación*, supra, pág. 29. Con este propósito se han identificado por lo menos tres (3) criterios que de ordinario se tienen en consideración al hacer el balance de intereses: (1) la naturaleza de la actuación gubernamental; (2) el impacto económico de la reglamentación sobre las personas o entidades afectadas, y (3) si el impacto económico sobre el individuo es menor que el interés protegido por la reglamentación. Véanse: 2 *Treatise on Constitutional Law: Substance and Procedure* Sec. 15.12(e) (1992); F.I. Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law*, 80 (Núm. 6) Harv. L. Rev. 1165 (1967).

■ Al amparo de este análisis se ha reconocido que la acción de estado constituye una incautación en las circuns-

tancias siguientes: en primer lugar, se ha requerido compensación cuando, como resultado de la reglamentación, el Estado invade física y permanentemente (*physical invasion*) una propiedad, "aun cuando sea de *minimis*". *Loretto v. Teleprompter Manhattan C.A.T.V. Corp.*, 458 U.S. 419 (1982).

■ De igual forma, se ha requerido compensación cuando la reglamentación *priva al dueño de todos los usos productivos en su propiedad. Agins v. Tiburon*, 447 U.S. 255 (1980). La teoría que inspira esta doctrina es que esta privación *total* del uso económico de una propiedad es equivalente a una invasión física que haga el Estado. En estos casos, para invocar el derecho a una justa compensación por una acción gubernamental, se requiere que la actividad en cuestión impida todo uso productivo en una propiedad:

> We think, in short, that there are good reasons for our frequently expressed belief that when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking. *Lucas v. South Carolina Coastal Council*, supra, pág. 815.

■ Sin embargo, en los casos de propiedades afectadas por zonificación no se activa este derecho simplemente porque la reglamentación impida el uso óptimo o más productivo de la misma. Véanse: *Penn Central Trasp. Co. v. New York City*, supra, pág. 125; *Goldblatt v. Town of Hempstead*, 369 U.S. 590 (1962); *Glisson v. Alachua County*, 558 So. 2d 1030, 1035 (1er Dist. Fla. App. 1990).

■ Tampoco procede per se una compensación cuando la reglamentación tenga el efecto de disminuir el valor de una propiedad. Véanse: *Hadacheck v. Sebastian*, 239 U.S. 394 (1915); Sackman, *Nichol's The Law of Eminent Domain 3d*, Sec. 6.17 (Supp. 1992). En *Keystone Bituminous Coal Ass. v. DeBenedictis*, supra, pág. 497, el Tribunal Su-

premo fededal aclaró que "la prueba para determinar si hay una incautación mediante reglamentación es comparar el valor que se le ha quitado a una propiedad con el que subsiste." (Traducción nuestra.) En ese caso el Tribunal Supremo federal analizó una ley que regulaba la extracción de carbón, y después de hacer un balance de intereses concluyó que el estatuto protegía el interés público y no causó una disminución *sustancial* en el valor de la propiedad.

 Bajo esta normativa, se requiere que el propietario demuestre que ningún uso permitido por la zonificación tendría el potencial de rendir beneficio alguno al dueño de los terrenos o que todo el valor de su propiedad ha sido destruido:

> If a zoning ordinance makes a sufficient contribution to the public, health, safety or welfare to be within the police power of the municipality, a litigant challenging the ordinance on constitutional grounds will rarely succeed without proving that the ordinance leaves him no viable use of this land. 5 *American Law of Zoning 3d* Sec. 33.27, pág. 174 (1986). Véase, también, *De St. Aubin v. Flacke*, 505 N.Y.S.2d 859 (1986).

 Por último, el Tribunal Supremo federal también ha determinado que denegar un permiso solicitado por un propietario no constituye una incautación si éste no queda impedido de dedicarla a otro uso razonable:

> A requirement that a person obtain a permit before engaging in a certain use of his or her property does not itself "take" the property in any sense: after all, the very existence of a permit system implies that permission may be granted, leaving the landowner free to use the property as desired. Moreover, even if the permit is denied, there may be other viable uses available to the owner. Only when a permit is denied and the effect of the denial is to prevent "economically viable" use of the land in question can it be said that a taking has occurred. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 127 (1985). Véase, también, Robinson, *Environmental Regulation of Real Property*, Sec. 3.04[2] (1992).

 Ahora bien, aunque el efecto de la privación sea temporero, al amparo de la Constitución de Estados Unidos se ha reconocido que procede una compensación por el tiempo en que el Estado privó al dueño de *todos* los usos productivos en su propiedad. *First Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987). En *Culebra Enterprises Corp. v. E.L.A.*, supra, y en *Pamel Corp. v. E.L.A.*, 124 D.P.R. 853 (1989), reconocimos la aplicabilidad de la doctrina de incautación temporera y, además, concluimos que el término prescriptivo aplicable a los casos de congelación de terrenos para uso público bajo la Ley Núm. 2 de 29 de enero de 1979 (32 L.P.R.A. sec. 2923 *et seq.*),(³) comienza a decursar desde que se libera la propiedad de las restricciones.

Considerada la normativa anterior, procede dilucidar si en el caso de autos las decisiones de A.R.Pe. y del Departamento de Recursos Naturales constituyeron una incautación de la propiedad de Arenas Procesadas. Examinemos, en primer lugar, lo referente a los permisos denegados por A.R.Pe.

### III

 En Puerto Rico "el derecho de propiedad no abarca el derecho de urbanizar un predio sin autorización gubernamental, *la cual puede condicionarse*". (Énfasis suplido.) *The Richards Group v. Junta de Planificación*, supra, pág. 35. El Art. 9 de la Ley de Planificación, Urbanización y Zonificación de Puerto Rico, Ley Núm. 213 de 12 de mayo de 1942, según enmendada, y el Art. 16 de la Ley Orgánica de la Junta de Planificación de Puerto Rico, 23 L.P.R.A.

---

(³) Mediante la Ley Núm. 46 de 26 de junio de 1987 se derogó la Ley Núm. 2 de 29 de enero de 1979 y se adoptaron los criterios para determinar cuándo se deniega todo uso productivo en una propiedad "debido exclusivamente a que por la misma se ha propuesto trazar una vía de transportación pública ... o porque los terrenos han sido destinados para uso público ...". 32 L.P.R.A. sec. 2924.

608

sec. 62o,[4] concedieron amplios poderes a la Junta de Planificación para adoptar reglamentos para fijar el uso y desarrollo de los terrenos y edificaciones por zonas y distritos. *Euclid v. Ambler Co.*, 272 U.S. 365 (1926); *López v. Junta de Planificación*, 80 D.P.R. 646, 652–660 (1958).

▪ Recientemente reiteramos los valores comunitarios protegidos por el ordenamiento de zonificación en Puerto Rico:

> Mediante la reglamentación de zonificación, el Estado asume un rol activo en el proceso de control y regulación de la utilización del limitado recurso tierra y de nuestro frágil ecosistema a fin de armonizar intereses y aspiraciones con las menores perturbaciones sociales. *Luan Investment Corp. v. Román*, 125 D.P.R. 533, 548 (1990).

▪ Dentro del marco fijado por las disposiciones de estas leyes de planificación, la Junta adoptó el Reglamento de Zonificación Núm. 4 mediante el cual se crearon varios tipos de distritos residenciales, comerciales, industriales y para uso público. Este reglamento dispone que un Distrito R-0 es especial, de baja densidad poblacional, que se establece con el propósito de "facilitar el control de la expansión o crecimiento urbano ... preservar terrenos de alta productividad agrícola; proteger áreas que requieran la preservación de su flora o fauna por su importancia económica, ecológica o científica; y proteger el disfrute y preservación de recursos de interés público tales como ... lagos, lagunas, fuentes naturales de agua, mangles, yacimientos minerales o playas". Sec. 6.01 del Reglamento de Zonificación (Reglamento de Planificación Núm. 4, Junta de Planificación de Puerto Rico, 1969).

---

[4] La Ley Orgánica de la Junta de Planificación de Puerto Rico, Ley Núm. 73 de 24 de junio de 1975 (23 L.P.R.A. sec. 62 *et seq.*), derogó el Art. 9 de la Ley Núm. 213 de 12 de mayo de 1942 y la sustituyó por el Art. 16 del nuevo estatuto. El Reglamento de Zonificación Núm. 4 fue revisado el 14 de enero de 1989. Sin embargo, las secciones del anterior reglamento relativas a la clasificación R-0 fueron incorporadas en su totalidad al nuevo reglamento, por lo que su interpretación es similar.

Cuando Arenas Procesadas adquirió el terreno en controversia tenía pleno conocimiento de que estaba ubicado en un Distrito R-0 y sabía de las limitaciones de uso impuestas por el Reglamento de Zonificación Núm. 4. De hecho, antes de comprar la propiedad, dicha empresa solicitó de A.R.Pᴇ. un permiso de uso no conforme legal para poder operar la cantera que existía en el solar.

A.R.Pᴇ. expidió el permiso de uso no conforme legal, pero impuso como condiciones especiales que la empresa obtuviera el endoso del Departamento de Recursos Naturales y de la Junta de Calidad Ambiental. También especificó que cualquier cambio de uso en ese terreno "conlleva la necesidad de un nuevo Permiso de Uso, tramitado mediante la solicitud correspondiente".

En vista de que este tipo de permiso, de naturaleza excepcional, se otorga únicamente en los casos en que una nueva zonificación proscribe un uso existente que anteriormente era legal, éste se concede sujeto a ciertas condiciones. Véanse: 1 *American Law of Zoning 2d* Sec. 6.08 (1976–85); *Asoc. Res. Baldrich, Inc. v. J.P. de P.R.*, 118 D.P.R. 759 (1987). En particular, se requiere que su poseedor no amplíe o intensifique el uso o utilice la propiedad con otro propósito. Además, se prohíbe la construcción de un nuevo edificio o la ampliación del existente. *American Law Zoning 2d*, supra, Sec. 6.46.

Esta normativa fue adoptada en Puerto Rico en el Reglamento de Zonificación Núm.4. En específico, en la Sec. 3.09 del Reglamento de Zonificación (1969), *supra*, se prohíben ampliaciones o alteraciones en los edificios existentes que incluyan cambios estructurales.[5] Igualmente, no se permite la intensificación en el uso no conforme legal. Sec. 3.07 del Reglamento de Zonificación (1969), *supra*.

█ Además, este permiso singular está sujeto a que se

---

[5] Ver Sec. 3.11 del Reglamento de Zonificación (Reglamento de Planificación Núm. 4, Junta de Planificación de Puerto Rico, 1989).

continúe con el uso no conforme legal. Si se descontinúa este uso no conforme legal por más de un (1) año, la Sec. 3.08[6] dispone que cualquier utilización futura de la propiedad tiene que cumplir con los requisitos de la zonificación existente. Al amparo de estos preceptos en Puerto Rico, el derecho de un propietario a un permiso de uso no conforme legal es limitado y está supeditado a que se cumpla estrictamente con las condiciones y que, en particular, ni se extienda ni se amplíe el uso permitido. Véase *American Law of Zoning 2d*, supra, Sec. 6.45.

En estas circunstancias, cuando Arenas Procesadas solicitó un permiso de construcción para instalar una nueva planta y ampliar sus operaciones, se colocó al margen del ordenamiento legal y no podía reclamar un derecho adquirido o una expectativa de que el permiso de construcción sería concedido.

Aunque inicialmente A.R.Pe. concedió el permiso de construcción, a los pocos días acogió una petición especial de la Junta de Planificación y dejó provisionalmente sin efecto su decisión. Cuando se envió el telegrama que ordenó la paralización de las obras, habían transcurrido solamente doce (12) días desde que se expidió el permiso y la empresa no había actuado a base de esa decisión ni había incurrido en gastos sustanciales. *Phi Delta Pi v. Junta Planificación*, 76 D.P.R. 585, 589 y 591 (1954).

Por otro lado, como la construcción propuesta era para intensificar un uso no conforme legal, la reglamentación expresamente requería que se obtuviera un nuevo permiso de uso al amparo de la reglamentación vigente. En esa fecha, el Reglamento de Zonificación Núm. 4 no autorizaba la operación de la cantera en un Distrito R-0. De esta manera se impedía la utilización de cualquier solar en esa

---

[6] Véase Sec. 3.10 del Reglamento de Zonificación (1989), *supra*, la cual es idéntica a la Sec. 3.07 del Reglamento de Zonficación (Reglamento de Planificación Núm. 4, Junta de Planificación de Puerto Rico, 1969).

área residencial para desarrollar una actividad que bajo nuestro ordenamiento constituiría *un estorbo público y una amenaza al ecosistema de la Laguna Tortuguero. Lucas v. South Carolina Coastal Council*, supra, pág. 821.

Del historial administrativo de este caso se desprende que A.R.Pe. adjudicó la controversia después de celebrar unas vistas públicas en que tanto Arenas Procesadas como todas las partes interesadas tuvieron la oportunidad de ser oídas. De hecho, la empresa nunca cuestionó el procedimiento utilizado para adjudicar sus peticiones. Tampoco recurrió a los remedios provistos por la Ley Núm. 76 de 24 de junio de 1975 (23 L.P.R.A. sec. 72c),[7] para cuestionar la decisión de A.R.Pe. En particular, la empresa no solicitó la reconsideración de la decisión ni apeló ante la Junta de Apelaciones sobre Construcciones y Lotificaciones. 23 L.P.R.A. sec. 72c. Tampoco recurrió al foro judicial. 23 L.P.R.A. sec. 72d.

Por otro lado, también surge de los autos que la empresa no probó que la denegación del permiso de construcción le impidió *todo uso productivo* de su propiedad. En el foro de instancia Arenas Procesadas únicamente sostuvo que la denegación de los permisos le impidió operar una cantera. La empresa sometió su caso a base de unas estipulaciones de hecho y no probó que el terreno no tenía otro uso productivo. Conforme a la doctrina aplicable, el hecho de que Arenas Procesadas no pudo construir una nueva planta de procesamiento de piedra e intensificar sus operaciones, no significa per se que esta propiedad no pueda ser utilizada para otros propósitos. *Pennsylvania Coal v. Mahon*, supra.

Como la zonificación R-0 permite otros usos y esto no significa que los terrenos han sido congelados para fines

---

[7] La Ley Núm. 170 de 12 de agosto de 1988 estableció la Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico, que ahora cubre los procedimientos de A.R.Pe. 3 L.P.R.A. sec. 2101 *et seq.*

públicos, correspondía a la empresa alegar y probar que la propiedad no podía ser utilizada de otra manera productiva.([8])

De las estipulaciones se desprende que Arenas Procesadas nunca solicitó una rezonificación del distrito ni un permiso para otros usos. Tampoco presentó una petición para que se le concediera una dispensa del cumplimiento de los requisitos del Reglamento de Zonificación Núm. 4. Véanse: 23 L.P.R.A. sec. 71e; *Williamson Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985).

Por otro lado, aunque el permiso de uso no conforme legal originalmente expedido les permitía continuar operando la cantera establecida en ese lugar, Arenas Procesadas descontinuó esta operación por más de un (1) año. Por ende, también perdió su derecho limitado a continuar con esas operaciones en ese solar. Véase Sec. 3.08 del Reglamento de Zonificación Núm. 4 (1969).

En estas circunstancias, Arenas Procesadas no probó que la denegación del permiso de construcción le privó de su propiedad sin el debido proceso de ley o impidió todo uso productivo del terreno. *Lucas v. South Carolina Coastal Council*, supra; *Penn Central Transp. Co. v. New York City*, supra; *Andrus v. Allard*, 444 U.S. 51, 65 (1979).

## IV

En lo referente al permiso de extracción de materiales de la corteza terrestre, al adquirir la propiedad con el propósito de operar una cantera, Arenas Procesadas también sabía que éste era un negocio extensamente reglamentado

---

([8]) Como al momento de adquirir la propiedad la empresa tenía conocimiento de las restricciones impuestas por la zonificación del área, también se colocó voluntariamente en una posición en que se autoinfligió los daños. Véase *A.R.P.E. v. J.A.C.L.*, 124 D.P.R. 858 (1989); *Asoc. Res. Baldrich, Inc. v. J.P. de P.R.*, 118 D.P.R. 759, 772 (1987), *Asoc., C.D. Octubre v. J.A.C.L.*, 116 D.P.R. 326, 334 (1985); 3 *American Law of Zoning 3d* Sec. 20.44 (1986).

por el Estado. La Ley Núm. 132 de 25 de junio de 1968 confirió jurisdicción al Secretario del Departamento de Recursos Naturales (Secretario) sobre los componentes de la corteza terrestre. Para poder excavar, extraer, remover o dragar estos componentes de la corteza terrestre se requiere un permiso expedido por el Secretario que se otorga por un (1) año. 28 L.P.R.A. sec. 210.

La ley autoriza al Secretario a revisar anualmente las condiciones y limitaciones del permiso y le prohíbe conceder estos permisos cuando "el lugar donde se desarrollaría la actividad fuese un área de pesca o un área recreativa ... o un área de reserva de recursos naturales ... o cuando dicho lugar estuviese localizado en los alrededores de las áreas mencionadas, y la labor de excavación, extracción, remoción o dragado pudiese afectar ... la integridad de los sistemas naturales del arrecife o del área de reserva". 28 L.P.R.A. sec. 210(d)(2).

En el caso de autos, aunque inicialmente el Secretario expidió el permiso, éste fue concedido por el término de un (1) año y con la condición específica de que no creaba un derecho y que tenía que ser renovado anualmente. Del Art. 5 de la Ley Núm. 132, *supra*, se desprende claramente que los permisos de extracción de componentes de la corteza terrestre, de ordinario, se conceden por un período no mayor de un (1) año bajo las condiciones y limitaciones establecidas por el Departamento de Recursos Naturales. En estas circunstancias, la concesión del permiso de extracción no crea el derecho ni la expectativa de que sea renovado anualmente.

En vista de la oposición de varios sectores de la comunidad, el Secretario celebró las vistas públicas según requerido por los Arts. 3 y 5 del estatuto, 28 L.P.R.A. secs. 208 y 210. A la luz de la prueba sometida en dichas vistas, el Secretario concluyó que las operaciones propuestas "podrían alterar los valores estéticos, biológicos, recreativos... de la laguna y, por ende interferir con el disfrute de la

Laguna tanto por los residentes del sector ... como por el pueblo de Puerto Rico". Por lo tanto, se negó a renovar el permiso.

Como el Departamento de Recursos Naturales celebró las vistas públicas antes de denegarle finalmente el permiso de extracción de materiales de la corteza terrestre, el Estado cumplió cabalmente con los requisitos estaturarios y constitucionales. Además, como el estatuto expresamente dispone que los permisos son por el término de un (1) año, y se conceden a discreción del Secretario con las condiciones y limitaciones que sean necesarias para garantizar que se proteja la salud, la seguridad, el interés público y la integridad de los recursos naturales del área (28 L.P.R.A. sec. 210), la negativa a renovarlos no es compensable. Véase *Sachman Nichols an Eminent Domain*, supra, Sec. 5.23.

Por último, esta decisión fue adecuadamente fundamentada en una extensa resolución que nunca fue cuestionada judicialmente por la empresa. El estatuto expresamente establece un trámite de reconsideración administrativo y revisión judicial que no fue agotado por Arenas Procesadas. 28 L.P.R.A. sec. 215.([9])

## V

Finalmente, la aprobación del Reglamento para la Cuenca Hidrográfica de la Laguna Tortuguero tampoco constituyó una incautación temporera de la propiedad en controversia. En primer lugar, la designación del área circundante a la Laguna Tortuguero como área de reserva natural constituye una determinación de política pública del Estado para proteger la laguna más grande de agua dulce existente en Puerto Rico en beneficio de toda la

---

([9]) La Ley de Procedimiento Administrativo Uniforme del Estado Libre Asociado de Puerto Rico es igualmente aplicable a los procedimientos del Departamento de Recursos Naturales que se celebren a partir de su fecha de vigencia.

comunidad. Al aprobar este reglamento, la Junta de Planificación describió de la manera siguiente la importancia de este recurso natural:

> La Laguna Tortuguero es la más importante de dos lagunas de agua dulce que existen en Puerto Rico. Su fauna y flora acuática son distintas a las de los demás lagos de Puerto Rico. Además de su biota acuática, existen unas 125 especies de plantas raras o en peligro de extinción dentro de los pantanos al sur de la Laguna. Siete (7) de éstas solamente se encuentran en este lugar, proveyendo además habitáculos (habitat) para varias especies de aves. Por los atributos de su fauna y flora, la Laguna y su área circundante constituyen un paraje de gran belleza, propio para la contemplación, recreación y disfrute de las presentes y futuras generaciones de puertorriqueños.
>
> La existencia y permanencia de este importante ecosistema natural están determinados por el flujo permanente de agua subterránea y superficial de la cuenca hidrográfica hacia la Laguna. Una reducción significativa en la cuantía o el deterioro de la calidad de las aguas que fluyen a la Laguna puede resultar en un desbalance en el equilibrio ecológico y acarrear su destrucción Resolución Núm. Z-83 de 5 de diciembre de 1978. *Reglamento de la Cuenca Hidrográfica Laguna Tortuguero*, junio de 1978.

La actuación de la Junta de Planificación es un ejercicio legítimo del poder de razón de estado. La denegación del permiso de construcción, fundamentado en que las operaciones de la cantera afectarían adversamente el acuífero natural de la laguna y todo su ecosistema, tenía el propósito de promover un interés estatal de proteger un valioso recurso natural y poner en vigor el mandato constitucional de la Sec. 19 del Art. VI de nuestra Constitución, *supra*.[10] Esta actuación es razonable y adelanta un fin público.

---

[10] Esta Sección dispone:

"Será política pública del Estado Libre Asociado la más eficaz conservación de sus recursos naturales, así como el mayor desarrollo y aprovechamiento de los mismos para el beneficio general de la comunidad; la conservación y mantenimiento de los edificios y lugares que sean declarados de valor histórico o artístico por la Asamblea Legislativa; reglamentar las instituciones penales para que sirvan a sus propósitos en forma efectiva y propender, dentro de los recursos disponibles, al tratamiento adecuado de los delincuentes para hacer posible su rehabilitación moral y social." Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 379.

La aprobación de este reglamento no tuvo el efecto de modificar la clasificación Distrito R-0 que tenía el lugar o de reservar ese terreno para fines públicos. Además, el solar de Arenas Procesadas no es el único afectado por un reglamento extensivo a todas las propiedades alrededor de la cuenca. Véase *Agins v. Tiburon*, supra, pág. 262. Una vez se aprobó el reglamento, Arenas Procesadas no sometió una petición para desarrollar su propiedad con fines productivos compatibles con el Distrito R-0 ni solicitó un cambio en la zonificación, una variación o una dispensa de los requisitos establecidos.

En su lugar, con la colaboración de las entidades gubernamentales pertinentes, Arenas Procesadas trasladó sus operaciones a otro municipio y dejó de pagar el préstamo hipotecario que había obtenido del Banco Gubernamental de Fomento para financiar sus instalaciones en el terreno objeto de esta controversia. Esta institución gubernamental ejecutó los terrenos en febrero de 1985.

*Conclusiones*

Examinada la controversia de autos a la luz de las doctrinas constitucionales anteriormente expuestas, *procede que revoquemos la sentencia recurrida. La denegación de los permisos para operar una cantera cerca de una reserva natural, en un distrito zonificado R-0, no constituyó una incautación de la propiedad. Arenas Procesadas no probó que el Estado le impidió todos los usos productivos en su propiedad entre 1977 y 1985.*

*Se dictará la sentencia correspondiente.*

El Juez Asociado Señor Fuster Berlingeri concurrió sin opinión escrita.