Vencedor Development Corporation, apelante, *v.* Autoridad de Carreteras de Puerto Rico, apelada.

*Número:* 0-84-523          *Resuelto:* 22 de junio de 1994

*Edwin Andújar Andújar,* abogado de la parte recurrente; *Frederick R. Auld,* abogado de la parte recurrida.

## SENTENCIA

El 16 de enero de 1969 Vencedor Development Corp. (en adelante Vencedor) sometió ante la Junta de Planificación (en adelante Junta) una solicitud de desarrollo preliminar para construir la segunda sección de la Urbanización Bayamón Highlands en una finca con cabida de 64.73 cuerdas, sitas al Este del entonces proyectado expreso Río Hondo y de la primera sección de Bayamón Highlands.[1] En el entretanto, el 8 de agosto de 1969 la Autoridad de Carreteras (en adelante Autoridad) y la firma De Leuw, Cather & Company suscribieron un contrato de diseño preliminar del Sistema de Transportación Colectiva Rápida para San Juan, conocido como el *Metro* de San Juan.

El 9 de septiembre de 1969 la Junta, por carta del Director del Negociado de Desarrollo y Uso de Terrenos, informó al Director Ejecutivo de la Autoridad que se había sometido ante la consideración de la Junta de Planificación el desarrollo preliminar de la segunda sección de la Urba-

---

[1] La finca en que Vencedor Development Corp. (eu adelante Vencedor) proyectaba construir la segunda sección de la Urbanización Bayamón Highlands era parte de una finca principal, propiedad de Vencedor, con cabida total de (174) cuerdas y en la cual Vencedor estaba desarrollando una primera sección. La Junta de Planificación (en adelante Junta) había aprobado los permisos de movimiento de tierra y de lotificación de la primera sección en 1968.

nización residencial Bayamón Highlands y que, según indicaciones del Comité Coordinador de Vías Públicas, esos terrenos se encontraban afectados por el terminal del Sistema de Transportación Colectiva Rápida para el área de Bayamón. Le solicitó a la Autoridad sus comentarios y recomendaciones con respecto a:

1. La localización del terminal.

2. Las entradas y salidas de vehículos a dicho terminal desde el futuro expreso Río Hondo.

En contestación a dicha carta, el 22 de octubre de 1969 *la Autoridad*, por conducto del Director de la Oficina de Transportación Colectiva, *señaló que*: "[a] esta fecha no estamos en posición de suministrarles la información solicitada, ya que el diseño preliminar del Sistema de Transportación Colectiva Rápida se comenzó recientemente." Alegato del apelado, Apéndice K, pág. 1. *No obstante esta comunicación*, el 5 de febrero de 1970 *la Junta* emitió una resolución en la que *aprobó el desarrollo preliminar* de la segunda sección de Bayamón Highlands *bajo la condición* de que se reservaran aproximadamente ocho (8) cuerdas de terreno para la ubicación del propuesto terminal de transportación colectiva. La Junta *justificó esta acción a base de una supuesta, y no identificada, "recomendación" de la Autoridad.* En el entretanto, sin embargo, no fue hasta noviembre de 1971 que estuvo preparado el estudio preliminar del *Metro* —Ruta Oeste, que es la ruta que pasaría por los terrenos de Vencedor— realizado por la firma de ingenieros De Leuw, Cather & Company.[2]

Varios años más tarde, el 28 de marzo de 1974, el Ing.

---

[2] *Preliminary Design-Rapid Mass Transit System San Juan Metropolitan Area, Interim Report: Location Studies—West Route*, Alegato del apelado, Apéndice L. El 8 de agosto de 1969 la Autoridad de Carreteras y la firma De Leuw, Cather & Company habían suscrito un contrato de diseño preliminar del Sistema de Transportación Colectiva Rápida para San Juan conocido como el *Metro* de San Juan. Véanse: Opinión y Sentencia del Tribunal Superior de 28 de febrero de 1984; Alegato del apelado, Apéndice H.

Miguel A. Barrera, *de la Autoridad*, envió una carta al Ing. Lionel Matta, *de la Junta*, indicándole, entre otras cosas, que aunque en febrero de 1970 la Junta había congelado ocho (8) cuerdas para el *Metro*, las mismas *no* correspondían a la localización indicada para el terminal del *Metro* en los planos preliminares preparados por De Leuw, Cather & Company, *razón por la cual recomendaba favorablemente a la Junta descongelar las mismas*[3] y permitir el desarrollo parcial de las facilidades de la urbanización que se encontraran localizadas fuera del área requerida para el terminal. En la carta se desglosaban también los solares a congelarse para el *Metro*, los cuales ocupaban un área de aproximadamente diecisiete (17) cuerdas.

El 28 de junio de 1974 *la Junta*, mediante la Resolución-Informe Núm. 74-Urb.-228 N.S.T. (Caso Civil Núm. 66-106-Urb.), aprobó el plano de *construcción parcial* para la segunda sección de la Urbanización El Cortijo en Bayamón.[4] En dicha resolución, la Junta hizo constar que mediante la aludida Carta de 28 de marzo de 1974 y una comunicación de 2 de abril de 1974, la Autoridad había endosado favorablemente los planos de construcción parcial de la segunda sección de la Urbanización El Cortijo, sujeto a que se congelaran una serie de solares allí desglosados (que ocupaban un total de diecisiete (17) cuerdas), toda vez que los mismos estaban afectados por el propuesto terminal (del *Metro*) de Santa Juanita. La Junta aprobó los planos congelando las diecisiete (17) cuerdas. *Nada dispuso en cuanto a las ocho (8) cuerdas anteriormente congeladas.*

Con posterioridad al 28 de junio de 1974, el Departamento de Transportación y Obras Públicas —nueva agen-

---

[3] A esa fecha las ocho (8) cuerdas originalmente congeladas por la Junta llevaban congeladas cuatro (4) años con un (1) mes.

[4] Vencedor cambió el nombre de la Urbanización Bayamón Highlands a El Cortijo.

cia a cargo del proyecto del *Metro*— actuando por recomendación de la firma Bechtel Inc., nuevos consultores en distintos aspectos del diseño preliminar del *Metro* de San Juan, *seleccionó otros terrenos* para la ubicación de los talleres de mantenimiento de dicho *Metro*. En vista de ello, el 2 de septiembre de 1975 *el Secretario del Departamento de Transportación y Obras Públicas* (en adelante D.T.O.P.) envió una carta al Presidente de la Junta, *solicitándole la descongelación* de las veinticinco (25) cuerdas de Vencedor.[5] *Más de un (1) año después*, el 17 de noviembre de 1976, *la Junta* emitió una resolución (Consulta 75-9-1875-PGU), en la cual descongeló las referidas veinticinco (25) cuerdas de Vencedor, según le fuera recomendado por el D.T.O.P. el 2 de septiembre de 1975.[6]

Vencedor radicó una acción civil contra la Autoridad en el Tribunal Superior, Sala de Bayamón, en la que alegó que las antes mencionadas veinticinco (25) cuerdas de terreno habían sido efectivamente objeto de una "incautación" en relación con la cual reclamó que se le expropiaran a cambio de una "justa compensación"; solicitó, además, daños y perjuicios. Por su parte, la Autoridad en su contestación negó responsabilidad y, adicionalmente, *planteó* la *falta de parte indispensable,* ya que la parte demandante no había incluido en la demanda a la Junta.

El tribunal de instancia, luego de una vista limitada a la determinación de responsabilidad de la Autoridad —se pospuso la determinación de cuantía de daños para una segunda etapa— desestimó la demanda por entender que Vencedor no había sufrido "incautación" alguna. Vencedor, inconforme, recurrió ante este Tribunal —vía recurso de apelación, al cual le dimos curso— alegando, en síntesis,

---

[5] A esta fecha, las ocho (8) cuerdas originalmente congeladas por la Junta llevaban congeladas cinco (5) años con siete (7) meses. Las otras diecisiete (17) cuerdas congeladas llevaban así un (1) año con tres (3) meses.

[6] En resumen, al momento de ser descongeladas por la Junta, ocho (8) de las cuerdas de Vencedor habían estado congeladas por seis (6) años y nueve (9) meses, y las otras diecisiete (17) cuerdas llevaban congeladas dos (2) años con cinco (5) meses.

que la congelación impuesta como condición para la concesión del permiso de construcción había producido el efecto de dejar las veinticinco (25) cuerdas congeladas sin "ninguna clase de uso" y "fuera del mercado de los inmuebles", razón por la cual debía ser compensado.

La Autoridad reitera, por su parte, que la demandante no ha acumulado como parte indispensable al Estado Libre Asociado, no obstante las intervenciones y decisiones de la Junta y del D.T.O.P.

I

Nos enfrentamos, en primer término, al planteamiento de la recurrida Autoridad sobre ausencia o defecto de parte indispensable. *Entendemos que le asiste la razón.* Ello, naturalmente, dispone del recurso.

Las Reglas 16.1 y 16.2 de Procedimiento Civil de 1979 (32 L.P.R.A. Ap. III) disponen, respectivamente:

> Las personas que tuvieran un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas según corresponda. Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada.
>
> . . . . . . . .
>
> El tribunal podrá ordenar la comparecencia de aquellas personas sujetas a su jurisdicción, que a pesar de no ser partes indispensables, deban ser acumuladas si se ha de conceder un remedio completo a las personas que ya sean partes en el pleito.

Desde *Pueblo v. Henneman*, 61 D.P.R. 189, 194 (1942), hemos reconocido que " '[u]na parte indispensable es aquella que tiene tal interés en la cuestión envuelta en la controversia que no puede dictarse un decreto final entre las otras partes en la acción sin lesionar y afectar radicalmente su interés' ". Jurisprudencia posterior ha reiterado esta normativa. *Fuentes v. Tribl. de Distrito*, 73 D.P.R. 959, 981 (1952). Véanse, además: *Hernández Agosto v. López Nieves*, 114 D.P.R. 601, 607 (1983); *Hernández Agosto v.*

*Romero Barceló*, 112 D.P.R. 407, 412–413 (1982). Nuestra Regla 16 de Procedimiento Civil, 32 L.P.R.A. Ap. III, "garantiza los valores siguientes: evitar multiplicidad de litigios, proveer a las partes un remedio final, completo y efectivo en el mismo pleito, y proteger a los ausentes de los efectos nocivos de una decisión sin su presencia". *Granados v. Rodríguez Estrada II*, 124 D.P.R. 593, 605 (1989). Véase, también, 7 *Wright, Miller and Kane, Federal Practice and Procedure: Civil 2d* Sec. 1604, pág. 40 (1986).

En atención a dichos intereses, en *Hernández Agosto v. López Nieves*, ante, expresamos que dicho precepto procesal debe de ser interpretado de forma pragmática. Ello exige un examen jurídico "en virtud de factores particulares en el contexto de cada caso, tales como tiempo, lugar, modo, alegaciones, prueba, clase de derechos, intereses en conflicto, resultado y finalidad". Íd., pág. 627. Se observa que esta Regla 16, ante, y la defensa que en virtud de la misma puede hacer una parte en determinado pleito, goza de tal primacía en nuestro ordenamiento jurídico que la misma puede invocarse, inclusive, por primera vez a nivel apelativo. *Hernández Agosto v. López Nieves*, ante.([7])

Luego de un minucioso examen de los hechos del caso de autos, y en vista de las actuaciones entremezcladas tanto de la demandada Autoridad así como de la Junta vinculadas a la alegada "incautación" de terrenos cuya compensación aquí se reclama,([8]) somos del criterio que no podemos concluir en esta etapa que la Autoridad sea la *única* res-

---

([7]) Esta no es la situación de la Autoridad de Carreteras (en adelante la Autoridad). De los autos se desprende que dicho litigante en innumerables ocasiones ante el foro de instancia invocó tal defensa. Reiteró tal pedimento en su comparecencia ante nos.

([8]) Como surge de la relación que de los hechos hiciéramos, en lo referente a las primeras ocho (8) cuerdas de terreno que fueron "congeladas" por la Junta, ésta así actuó el 5 de febrero de 1970 sin contar con una recomendación, específica y expresa a esos efectos, de la Autoridad. Tenemos, adicionalmente, que la Junta se negó a "descongelar" en 1974 las referidas ocho (8) cuerdas, no obstante una recomendación específica a esos efectos de un ingeniero de la Autoridad. Finalmente tenemos que, no obstante el Departamento de Transportación y Obras Públicas haber recomendado a la Junta la "descongelación" de todas las veinticinco (25) cuerdas en 1975, por razón de que se habían seleccionado otros terrenos para la ubicación del *Metro* de San Juan, la Junta tardó un (1) año en así hacerlo.

ponsable de la *alegada* "incautación" sufrida por Vencedor. Tampoco podemos concluir, por otro lado, que la Junta sea la única responsable. Los hechos demuestran la *posibilidad* de que la responsabilidad, por la "incautación" que *alega* Vencedor, sea *compartida* entre la Autoridad y la Junta.[9] Ante dicha situación, la comparecencia de la Junta se hace necesaria para que el foro de instancia pueda conceder un remedio efectivo y completo. *Hernández Agosto v. López Nieves*, ante; *Hernández Agosto v. Romero Barceló*, ante; *Cepeda Torres*, ante.

Ello no nos obliga, sin embargo, a decretar la desestimación de la acción radicada y sí a ordenar que dicha parte indispensable sea traída al pleito. *Meléndez Gutiérrez v. E.L.A.*, 113 D.P.R. 811, 816 (1983). En vista de lo expresado, una vez devuelto el caso de epígrafe al foro de instancia, deberá procederse a traer como partes en el pleito a la Junta y al Estado Libre Asociado, este último en virtud de las disposiciones de la Regla 4.4(g) de Procedimiento Civil, 32 L.P.R.A. Ap. III.[10]

Por los fundamentos antes expresados, *se dicta sentencia revocatoria de la emitida por el Tribunal Superior de Puerto Rico, Sala de Bayamón; devolviéndose el caso a dicho foro judicial para procedimientos ulteriores consistentes con lo aquí expuesto y resuelto.*

Así lo pronunció, manda el Tribunal y certifica el señor Secretario General. El Juez Asociado Señor Rebollo López emitió una opinión concurrente, a la cual se unió la Juez

---

[9] Cobra relevancia la deposición que le fuera tomada el 23 de agosto de 1977 al Ing. Adalberto Colón, Director del Negociado de Consultas de la Junta, a la cual compareció en representación del Presidente de la Junta y en la que expresó que dicha entidad tiene facultad discrecional para acoger o rechazar las "peticiones" que agencias como la Autoridad le hacen para que ésta reserve y congele terrenos para uso público. T.E., págs. 15–22. A preguntas del licenciado Rivera, dicho funcionario contestó que se han dado circunstancias en que la Junta ha desaprobado una petición de una agencia o del Gobierno. T.E., pág. 32.

[10] En cuanto a la naturaleza y facultades de la Junta, véanse: Arts. 2 y 11(2) de la Ley Núm. 75 de 24 de junio de 1975 (23 L.P.R.A. secs. 62a y 62j(2)); *El Vocero v. Junta de Planificación*, 121 D.P.R. 115, 122 (1988); *Néstor Colón Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32 (1er Cir. 1992).

Asociada Señora Naveira de Rodón. El Juez Asociado Señor Fuster Berlingeri emitió una opinión concurrente. El Juez Asociado Señor Negrón García emitió una opinión disidente, a la cual se unió el Juez Presidente Señor Andréu García. El Juez Asociado Señor Hernández Denton no intervino. El Juez Asociado Señor Alonso Alonso se inhibió.

(*Fdo.*) Francisco R. Agrait Lladó
*Secretario General*

— O —

Opinión concurrente emitida por el Juez Asociado Señor Rebollo López, a la cual se une la Juez Asociada Señora Naveira de Rodón.

Estimamos correcta la sentencia que el Tribunal emite en el día de hoy en el presente caso; esto es, entendemos acertada la determinación mayoritaria a los efectos de que el presente caso adolece del defecto de parte indispensable. Ello no obstante —y en atención a las expresiones suscritas por dos (2) de los Jueces de este Tribunal, en la opinión disidente, págs. 497–498, que emiten, a los efectos de que "de acuerdo con los parámetros constitucionales y legales prevalecientes, las peculiaridades de este caso configuran una *incautación temporal* que exige compensación" (énfasis en el original)— *nos vemos en la obligación de expresarnos al respecto.* Ello con el propósito de evitar confusión a nivel de instancia y en la clase togada.

La errada opinión de estos dos (2) integrantes del Tribunal es perfectamente comprensible y explicable. La misma se debe, *en primer lugar*, a que éstos —aparentemente sin darse cuenta de ello— *interpretan erróneamente* las decisiones que sobre la materia ha emitido el Tribunal Supremo de los Estados Unidos; decisiones que nos obligan y mediante las cuales dicho Alto Foro ha establecido unas guías o parámetros de índole general que, en ocasiones,

resultan difíciles de entender y aplicar.([1]) En segundo término, dichos compañeros Jueces *aplican erróneamente* a los hechos del presente caso nuestra propia jurisprudencia.

I

En *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 439 (1982), el Tribunal Supremo de los Estados Unidos estableció la norma a los efectos de que la ocurrencia de una *ocupación física* de propiedad privada por parte del Estado *siempre conlleva* la configuración de una "incautación", tan extensa como la ocupación acaecida, independientemente del hecho de que ésta responda a algún interés legítimo del Estado o de que su impacto económico sobre la propiedad privada fuera mínimo. Dicho de otra manera, *"ocupación física" equivale a "incautación"*, lo cual conlleva *necesariamente* la obligación constitucional del Estado de pagar una "justa compensación" por la *"incautación"* efectuada. *Armstrong v. United States*, 364 U.S. 40, 49 (1960); Emdas. II y XIV, Const. EE. U.U., L.P.R.A., Tomo 1.

En 1986 el Tribunal Supremo de los Estados Unidos se enfrentó, y resolvió —en *First Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987)— la interrogante de si la Quinta Enmienda de la Constitución de los Estados Unidos, ante, según incorporada y aplicada a los estados a través de la Décimocuarta Enmienda de dicha Constitución, ante, requiere el pago de "justa compensación" en aquellas situaciones en que ha ocurrido una "incautación" que es *meramente "temporal"*. La contestación fue *en la afirmativa*; esto es, se resolvió que si efectivamente ha ocu-

---

([1]) Como podremos percatarnos de la exposición que haremos más adelante, el Tribunal Supremo de los Estados Unidos se ha abstenido de definir los *componentes concretos* del derecho de propiedad al amparo de la Constitución federal, estableciendo un patrón de deferencia hacia los foros locales y sus determinaciones sobre el contenido preciso de este derecho. Véase L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, págs. 608–609.

rrido una "incautación" de propiedad privada por parte del Estado, *poco importa* —a los fines de la obligación de tener que compensar por ello— que dicha "incautación" haya sido de índole "temporal". Resulta necesario enfatizar el hecho de que en el citado caso de *First Lutheran Church v. Los Angeles County,* el Supremo federal no resolvió, en relación con los hechos de dicho caso, cuándo es que la actuación del Estado efectivamente constituye una "incautación"; esto es, simplemente se limitó a "establecer" la modalidad o concepto de la "incautación temporal".

Durante ese mismo término (1986–1987), el Tribunal Supremo federal resolvió el caso de *Nollan v. California Coastal Comm'n,* 483 U.S. 825 (1987); caso cuyos hechos, si bien no son iguales a los del recurso que ocupa nuestra atención, son similares a los de éste. Examinémoslos. En 1982, James y Marilyn Nollan sometieron ante la Comisión Costera de California (la Comisión) *una solicitud de permiso* para construir una casa en un solar de su propiedad.([2]) La Comisión concedió el permiso solicitado *sujeto a la condición* de que los Nollan consintieran a la creación de una servidumbre de paso (*public easement to pass*) a lo largo de una franja de su playa, delimitada ésta por la línea de marea alta, de un lado, y del otro por una muralla de ocho (8) pies de altura que separaba la porción de playa de la finca de los Nollan del resto de su terreno.([3]) Los Nollan impugnaron judicialmente la condición im-

---

([2]) De la relación de los hechos del caso se desprende que el solar de los Nollan estaba contiguo al mar e incluía una playa privada. El solar quedaba a su vez localizado entre dos (2) playas públicas (a mil ochocientos (1,800) metros al norte de la playa conocida como "the Cove" y a un cuarto de milla al sur de "Faria County Park", otra playa pública). *Nollan v. California Coastal Comm'n,* 483 U.S. 825, 828 (1987).

([3]) Luego de vistas públicas, la Comisión Costera de California determinó que la construcción de la nueva estructura aumentaría la obstaculización de la vista hacia el mar, contribuyendo así al desarrollo de una pared de estructuras residenciales que prevendrían psicológicamente el que el público se percatara de la existencia de un área costera al cual tenían derecho a visitar. La Comisión concluyó que los efectos acumulativos de la construcción de la estructura propuesta por los Nollan y de otros desarrollos en el área sería dificultar el acceso del público a la playa, por lo que mantuvo en pie la condición impuesta. *Nollan v. California Coastal Comm'n,* ante, págs. 828–829.

puesta, alegando que violaba la cláusula de incautación de la Quinta y Décimocuarta Enmiendas de la Constitución federal, ante. El caso llegó, en última instancia, al Tribunal Supremo de los Estados Unidos.

Dicho Alto Foro federal —citando con aprobación las decisiones emitidas en *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 127 (1978), y en *Agins v. Tiburon*, 447 U.S. 255, 260 (1980)— expresó, en primer lugar, que constituía *norma reiterada* que la regulación, mediante la imposición de condiciones por el Estado, del uso de tierras privadas *no* constituye una "incautación" *siempre que* dicha regulación sustancialmente promueva, o fomente, intereses legítimos del Estado y la misma no niegue al dueño el uso viable económico de su propiedad. *Por otro lado*, y no obstante reiterar la norma establecida en *Loretto v. Teleprompter Manhattan CATV Corp.*, ante —a los efectos de que la ocupación física permanente equivale a "incautación"— el Tribunal *se negó* a aplicar la misma de manera automática, prefiriendo esbozar criterios adicionales con el propósito de que se pueda determinar *cuándo* se configura una "incautación" *en situaciones en que el Estado*, a diferencia de casos en que inicia la ocupación física, *meramente responde* a una solicitud de permiso de uso de una propiedad, *condicionando* la concesión del mismo a que el dueño, a su vez, consienta a una condición que conlleva la ocupación física *de parte* de su propiedad.

A esos efectos, y a nuestro juicio, el Tribunal Supremo federal estableció en *Nollan v. California Coastal Comm'n*, ante, págs. 834–837, la norma general siguiente:

La condición requerida para la concesión de un permiso de uso de terrenos, aun cuando pueda resultar en el equivalente a una ocupación física, *no* constituye una "incautación" (y por lo tanto no requerirá compensación) si:

a) La negación del permiso no constituye, per se, una "incautación"; ésto es, si el Estado puede válidamente negar el permiso solicitado.

b) La condición impuesta sirve el mismo propósito de razón de estado que serviría la negación del permiso y este propósito

de razón de estado, a su vez, es un fin legítimo. (Traducción nuestra.)

En *Nollan v. California Coastal Comm'n*, ante, el Tribunal dispuso del caso aplicando la segunda de las partes del *test*.(⁴) A juicio del Tribunal, la creación de una servidumbre de paso a lo largo de la playa de los Nollan *no* guardaba relación alguna con el fin que alegadamente perseguía el Estado: asegurar que habría vista a la playa desde la calle. Según tales circunstancias, el Tribunal resolvió que la condición impuesta como requisito para la concesión del permiso solicitado no constituía un legítimo ejercicio del poder de razón de estado, sino un "out-and-out plan of extortion". Íd., págs. 838–839.

La última decisión del Tribunal Supremo de los Estados Unidos, en lo pertinente al tema ante nuestra consideración, lo es la emitida en *Lucas v. So. Carolina Coastal Council*, 505 U.S. 1003 (1992). Este caso presentó la controversia de si el poder del Estado para prohibir los usos de la propiedad privada que resulten *nocivos* a los demás exime al Estado del deber de compensar por reglamentación del uso de terrenos que priva a su propietario de todo uso económico o productivo de los mismos. David Lucas, un desarrollador, era propietario de dos (2) lotes de terreno en la costa de Carolina del Sur cuando la Asamblea Legisla-

---

(⁴) En *Nollan v. California Coastal Comm'n*, ante, el Tribunal realmente *no* aborda la controversia que plantearía la impugnación de la negación de un permiso de uso. No se trata aquí de la constitucionalidad de la negativa de conferir el permiso solicitado, sino de la validez del requerimiento hecho como condición para la concesión del permiso. *Nollan v. California Coastal Comm'n*, ante, no ofrece criterios para determinar cuándo una negación de permiso equivale a un ejercicio válido del poder de razón de estado más allá de su reiteración de lo dicho en *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), y en *Agins v. Tiburon*, 447 U.S. 255 (1980), a los efectos de que:

"('[A] use restriction may constitute a "taking" if not reasonable necessary to the effectuation of a substantial government purpose'). Our cases have not elaborated on the standards for determining what constitutes a "legitimate state interest" or what type of connection between the regulation and the state interest satisfies the requirement that the former "substantially advance" the latter. They have made clear, however, that a broad range of governmental purposes and regulations satisfies these requirements." (Escolios y citas omitidas.) *Nollan v. California Coastal Comm'n*, ante, págs. 834–835.

tiva de ese estado aprobó el *Beachfront Management Act*, estatuto que prohibía la construcción de estructuras permanentes en el área costera en que se encontraban sus parcelas. Lucas radicó una demanda en el foro estatal en la que admitió que el estatuto impugnado era un ejercicio válido del poder de razón de estado, pero alegó que la prohibición impuesta bajo el mismo le privaba de todo uso económico de su propiedad y, por lo tanto, constituía una "incautación". El tribunal de instancia falló a favor de Lucas *luego de determinar que la reglamentación impuesta había dejado sus parcelas sin valor alguno.* El Tribunal Supremo de Carolina del Sur, sin alterar esa determinación, revocó, apoyándose en *Mugler v. Kansas*, 123 U.S. 623 (1887).(⁵)

Citando con aprobación a *Penn Central Transp. Co. v. New York City*, ante, el Supremo federal recordó, de entrada, que consistentemente se había negado a establecer reglas absolutas en la determinación de cuándo una reglamentación puede constituir una "incautación", *señalando que esa es una determinación que debe hacerse caso a caso.* El Tribunal, sin embargo, *identificó dos (2) categorías de acción reglamentaria que requieren compensación, independientemente del fin o propósito que persigue el Estado al ponerlas en vigor.* La *primera* de estas categorías aplica cuando el Estado ha realizado una *ocupación física* de propiedad privada. *Lucas v. So. Carolina Coastal Council*, ante, citando a *Loretto v. Teleprompter Manhattan CATV Corp.*, ante. La *segunda*, en aquellas circunstancias extraordinarias y relativamente raras en que la actuación del Estado ha privado al titular dominical de *todo uso económicamente beneficioso o productivo de su bien. Lucas v. So. Carolina Coastal Council*, ante, citando, entre otros, a

---

(⁵) En *Mugler v. Kansas*, 123 U.S. 623 (1887), el Tribunal Supremo federal había sostenido que, en relación con una reglamentación estatal que tiene como propósito evitar un uso nocivo o dañino de propiedad privada equivalente a un estorbo público, el Estado no tiene la obligación de compensar independientemente de cuál sea el efecto de la reglamentación sobre la propiedad privada.

*Agins v. Tiburon,* ante, y a *Nollan v. California Coastal Comm'n,* ante.

Al analizar la validez del planteamiento del Estado, a los efectos de que no venía obligado a compensar por las consecuencias producidas por la reglamentación dirigida a prevenir los efectos nocivos del uso de propiedad privada, el Tribunal aclaró que la vieja doctrina de "usos nocivos o dañinos" era simplemente la precursora doctrinal del *criterio contemporáneo* de que la reglamentación del uso de tierra no constituye "incautación" si sirve para adelantar sustancialmente un fin o interés estatal legítimo y no priva de su uso económico. Habiendo, sin embargo, el tribunal inferior en el presente caso *específicamente determinado* que la reglamentación impugnada había causado que las parcelas de terrenos del demandante *no tuvieran valor alguno,* el Tribunal Supremo federal expresó que, bajo tales circunstancias, *era aplicable la norma conforme a la cual se entiende configurada una "incautación" independientemente de que la reglamentación en cuestión adelante o no sustancialmente un fin estatal legítimo.*

Como *única excepción* a esta norma, el Tribunal señaló:

> Where the State seeks to sustain regulation that deprives land of all economically beneficial use, we think it may resist compensation only if the logically antecedent inquiry into the nature if the owner's estate shows that the proscribed use interests were not part of his title to begin with. *Lucas v. So. Carolina Coastal Council,* ante, pág. 820.

En otras palabras, lo que el Tribunal Supremo federal resuelve en *Lucas v. So. Carolina Coastal Council,* ante, es que *la reglamentación* del uso de un bien que produzca el efecto de privar a su dueño de *todo* uso económico, *equivaldrá* a una "incautación", independientemente del interés legítimo que persiga el Estado, *a menos que* tal reglamentación no limite las prerrogativas dominicales reconocidas por el derecho civil patrimonial estatal. Esto es, si lo prohibido por la reglamentación está también prohibido por la

ley de propiedad y estorbos estatal el *efecto neto* será que la reglamentación impuesta no estaría prohibiendo nada que no esté ya prohibido; *por lo que siguiendo el viejo adagio de que a nadie le pueden quitar lo que no tiene, la reglamentación prohibitoria no podría producir "incautación" alguna.* Ésta, conforme al Tribunal Supremo federal, es una determinación que debe hacerse bajo el derecho estatal, razón por la cual el caso fue devuelto a los tribunales de Carolina del Sur. Dichos tribunales, como últimos intérpretes del derecho de propiedad estatal, constituían, en opinión del Tribunal, el foro competente para determinar si se debía aplicar o no la mencionada excepción.

*En resumen*, y en lo pertinente, tenemos que conforme la jurisprudencia federal antes citada se entiende efectuada una "incautación" —la cual *necesariamente* conlleva la obligación del Estado de pagar una justa compensación, *Armstrong v. United States*, ante— *en las siguientes situaciones*: (1) cuando el Estado *físicamente ocupa* la propiedad, *Loretto v. Teleprompter Manhattan CATV Corp.*, ante; (2) cuando, no obstante no ocurrir una ocupación física de la propiedad, la acción del Estado tiene el efecto de *privar* a la propiedad de *todo* uso económico viable y productivo,[6] *Lucas v. So. Carolina Coastal Council*, ante, y (3) cuando la interferencia del Estado con el derecho de propiedad es excesiva ("goes too far", *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393 (1922), decisión ésta que deberá hacerse caso a caso, *Penn Central Transp. Co. v. New York City*, ante, conforme al contenido específico del derecho patrimonial estatal, *Lucas v. So. Carolina Coastal Council*, ante, y tomando en cuenta que tal interferencia nunca habrá de constituir una "incautación" si la misma fomenta un interés estatal legítimo y no priva *todo* uso económico de la

---

[6] Con la única excepción de que el Estado, mediante la exigencia requerida, lo que ha hecho es meramente poner en vigor una prohibición general existente en el ordenamiento jurídico en particular. *Lucas v. So. Carolina Coastal Council*, ante.

propiedad, *Penn Central Transp. Co. v. New York City*, ante; *Lucas v. So. Carolina Coastal Council*, ante.[7]

Debe enfatizarse el hecho, por otro lado, que en relación con *cualesquiera* de las tres (3) antes expuestas situaciones —en las cuales se entiende efectuada, o se determina que ha ocurrido una "incautación"— el Estado viene obligado a pagar una justa compensación *aun cuando la "incautación" efectuada haya sido de índole "temporal"*. Véase *First Lutheran Church v. Los Angeles County*, ante.

## II

*Por nuestra parte*, y desde hace varias décadas, hemos reconocido que el derecho de propiedad cumple una función social, razón por la cual su ejercicio debe acomodar o servir a los intereses de la sociedad y no exclusivamente los de su titular. *Rivera v. R. Cobián Chinea & Co.*, 69 D.P.R. 672, 676 (1949). En específico, *y en lo pertinente a la controversia hoy ante nuestra consideración*, hemos resuelto que en nuestra jurisdicción el derecho de propiedad *no abarca el derecho a urbanizar un terreno sin autorización gubernamental*, el cual puede ser condicionado. *The Richards Group v. Junta de Planificación*, 108 D.P.R. 23, 35 (1978); *Flamboyán Gardens v. Junta de Planificación*, 103 D.P.R. 884 (1975); *Heftler International, Inc. v. J. de P.*, 99 D.P.R. 467 (1970). Recientemente reiteramos esa norma, señalando expresamente que:

> ... el Estado tiene un poder inherente para realizar actos que promuevan la salud, la seguridad y el bienestar de la comunidad mediante reglamentación razonable que limite el uso de una propiedad. *Arenas Procesadas, Inc. v. E.L.A.*, 132 D.P.R. 593, 603 (1993).

---

[7] Resulta procedente señalar que en relación con las *dos (2)* primeras situaciones, el Estado viene en la obligación de pagar una justa compensación *independientemente* del hecho de que la acción del Estado haya estado predicada en la consecución de un interés público legítimo. *Lucas v. So. Carolina Coastal Council*, ante.

¿Cuándo, *conforme a nuestra jurisprudencia,* es que la condición impuesta por el Estado para la concesión de la autorización a urbanizar constituye un ejercicio legítimo del poder de razón de Estado y cuándo la misma equivale a una "incautación" y, en consecuencia, se tiene el derecho a ser compensado? Esa fue la controversia planteada en *Flamboyán Gardens v. Junta de Planificación,* ante, y en *The Richards Groups v. Junta de Planificación,* ante; la cual intentamos resolver mediante la enumeración de una serie de criterios que deben ser considerados a esos efectos.(⁸)

## III

El *problema principal* que, a nuestro juicio, confronta la opinión disidente emitida es que *erróneamente equipara* la

---

(⁸) En *Flamboyán Gardens v. Junta de Planificación,* 103 D.P.R. 884 (1975), los criterios enumerados fueron: (1) la naturaleza de la mejora pública que requiere la paralización del uso de terrenos; (2) la prioridad de la misma en el programa de mejoras públicas; (3) el costo del terreno y los recursos disponibles; (4) la magnitud del perjuicio al dueño del terreno (si se trata de un proyecto de urbanización debe considerarse el valor de los terrenos congelados en relación con el desarrollo total aprobado); (5) la posibilidad de otros usos productivos del terreno que no hagan más oneroso el desarrollo de la futura mejora pública, y (6) la extensión del tiempo transcurrido. Íd., págs. 891–892.

En *The Richards Group v. Junta de Planificación,* 108 D.P.R. 23 (1978), los criterios señalados fueron: (1) el papel que juega la tierra en nuestra economía; (2) la expansión reconocida al poder de razón de estado; (3) las tendencias similares en países con tradiciones comparables a la nuestra sobre el concepto de la propiedad; (4) la búsqueda de un acomodo razonable entre el poder de razón de estado y el de expropiación forzosa a la luz de las circunstancias específicas y la atmósfera ideológica en que ésta se produce; (5) los beneficios a recibirse por la urbanización; (6) el detrimento a sufrirse por el urbanizador (el grado en que se disminuye el valor de su propiedad en contraste con los beneficios derivables por el interés público y el tamaño de su propiedad frente a la naturaleza de la condición impuesta); (7) la identidad de la persona afectada (es razonable distinguir entre quien intenta urbanizar su tierra como negocio y el dueño no empresario) y el grado de razonabilidad de la reglamentación de un negocio; (8) el impacto socioeconómico de los requisitos impuestos y su efecto sobre la industria de la construcción; (9) la correspondencia entre los costos públicos y el beneficio general que entrañen las condiciones impuestas; (10) si la condición impuesta responde a una política administrativa uniforme para casos comparables; (11) el grado en que la urbanización contribuye a la exacción o si ésta se debe a un plan público de desarrollo anterior a la solicitud de urbanizar, y (12) la relación entre el requisito impugnado y la función pública a servirse. Íd., págs. 39–45.

imposición de una condición por parte del Estado —la cual tiene el efecto de "congelar" unos terrenos— con el concepto "incautación", *lo cual es, obviamente, erróneo*. El concepto de "incautación" *es algo más* que la mera "congelación" de unos terrenos, resultada la misma de la imposición de una condición por el Estado en relación a una solicitud de un urbanizador. Véase *Nollan v. California Coastal Comm'n*, ante, págs. 836–837.

El caso de autos *no* es el caso clásico de expropiación forzosa en el que el Estado decide separar un bien privado para uso público y actúa, afirmativamente, a esos fines. En el caso de autos, al igual que en *Nollan v. California Coastal Comm'n*, ante, el Estado, en el ejercicio de su poder para reglamentar el uso de la propiedad privada, ha *condicionado* la concesión del permiso para urbanizar solicitado por Vencedor Development Corp. (Vencedor). El Tribunal Supremo federal expresó en *Nollan v. California Coastal Comm'n*, ante, que esta *sutil diferencia* es *determinante* para identificar el criterio o *test* que deben aplicar los tribunales al determinar si la actuación del Estado constituye o no una "incautación". Apliquemos, pues, el *test* de *Nollan v. California Coastal Comm'n*, ante, a los hechos del caso de autos.

Conforme lo resuelto en dicho caso, lo determinante para concluir si ha ocurrido o no una "incautación", *en casos como el que nos ocupa*, lo es:

1. Si el Estado podía haber negado válidamente el permiso solicitado.

2. Si la condición impuesta para la concesión del permiso adelanta el mismo propósito legítimo de razón de estado que adelantaría la negación del permiso.

En cuanto a la *segunda* parte del *test* o criterio antes mencionado debemos señalar que, según indica la opinión disidente, pág. 496, "[l]a utilidad pública y la necesidad del fin que perseguía la actuación de la Autoridad —sistema rápido de transportación colectiva— fue *admitida* por

Vencedor". (Énfasis suplido.) Ciertamente la legitimidad de este fin público debe estar fuera de toda duda. En nuestra opinión, tampoco debe haber duda alguna de la existencia de *nexo racional* entre ese fin estatal legítimo y la condición impuesta a Vencedor para la concesión del permiso de construcción; razón por la cual resulta ser incuestionable que el Estado "cumple" con esta *segunda* parte de dicho *test* o criterio.

En vista de ello, somos de la opinión de que la *primera* parte del *test* de *Nollan v. California Coastal Comm'n*, ante, resultaría ser crucial para la disposición final del caso de autos. Sin embargo, en dicho caso el Tribunal Supremo federal dispuso del caso aplicando sólo la segunda parte del *test,* por lo que no ofreció criterios o explicación alguna en cuanto a la aplicación de la *primera* parte, esto es, la determinación de cuándo puede el Estado negar válidamente un permiso de uso.

Ahora bien, tanto en *Nollan v. California Coastal Comm'n*, ante, como luego en *Lucas v. So. Carolina Coastal Council,* ante, el Tribunal Supremo federal citó con aprobación el *test* de *Penn Central Transp. Co. v. New York City*, ante. Allí, se resolvió que la reglamentación estatal del uso de la propiedad privada *no constituye "incautación" cuando ésta adelanta sustancialmente un interés estatal legítimo y no priva al dueño de todo uso económico de su propiedad. Lucas v. So. Carolina Coastal Council,* ante. Este fue el criterio que aplicamos en *Arenas Procesadas, Inc. v. E.L.A.,* ante, para determinar si el Estado había actuado válidamente al negar un permiso de uso. *En nuestra opinión, éste debe ser también el criterio aplicable al caso de autos en cuanto a la primera parte del test de Nollan v. California Coastal Comm'n, ante.*

Ahora bien, esta norma —privación de todo uso económico de la propiedad— *no* es tan fácil de aplicar como de primera impresión aparenta ser. El propio Tribunal Supremo federal ha señalado que este enunciado goza de ma-

yor fuerza retórica que de precisión. *Lucas v. So. Carolina Coastal Council*, ante, pág. 813 esc. 7. Sin embargo, ese mismo Tribunal ha sugerido que la dificultad en la aplicación de este enunciado puede ser salvada refiriendo el análisis al derecho de propiedad estatal y, en particular, a las expectativas razonables que bajo ese derecho se reconocen al titular dominical. *Conforme sugiere el Tribunal Supremo federal, el criterio rector debe ser el siguiente*: hasta qué punto, si alguno, el derecho de propiedad estatal reconoce protección legal al interés propietario con respecto al cual el reclamante de la "incautación" alega haber sufrido la disminución o eliminación de su valor.

Vencedor alega haber sufrido una "incautación" de su propiedad por no haber podido urbanizar veinticinco (25) de sus ciento setenta y cuatro (174) cuerdas. Como ya hemos dicho, nuestro derecho de propiedad no abarca el derecho a urbanizar libre de restricciones y permisos por parte del Estado. *Heftler v. Junta de Planificación*, ante. Los criterios que nuestro derecho de propiedad reconoce para determinar hasta qué punto pueden llegar esas restricciones ya han sido establecidos. *Flamboyán Gardens v. Junta de Planificación*, ante; *The Richards Group v. Junta de Planificación*, ante. Corresponde, entonces, evaluar los hechos de este caso a la luz de esos criterios.[9]

---

[9] Aun cuando la Ley Núm. 46 de 26 de junio de 1987 (32 L.P.R.A. secs. 2923–2927) no es de aplicación a los hechos de este caso —ello por la obvia razón de que los mismos ocurrieron antes de que dicha Ley Núm. 46 fuera aprobada y entrara en vigor— *la misma puede resultar ilustrativa y servirnos de guía en la correcta solución del presente caso.*

Mediante el Art. 1 de la citada Ley Núm. 46 (32 L.P.R.A. sec. 2923) se establece, como política pública del E.L.A., que los costos de proveer terrenos para usos públicos se deben distribuir entre los propietarios particulares de los mismos y la ciudadanía en general, quien en última instancia es la beneficiaria de toda obra pública gubernamental. A tales fines, la Asamblea Legislativa entendió necesario adoptar criterios y términos uniformes para determinar cuándo los costos al propietario trascienden los beneficios a la sociedad. Íd. En su Art. 2, la mencionada ley dispone que una "afectación" significa:

"... la *denegación de todo uso productivo en una propiedad* debido exclusivamente a que por la misma se ha propuesto trazar una vía de transportación pública conforme a un plan de transportación o plan vial adoptado por la Junta de Planificación, o porque los terrenos han sido destinados para uso público en un mapa de

Ahora bien, en vista de que a nivel de instancia *nunca* se pasó prueba de los efectos ocasionados por la condición impuesta durante el tiempo que esta estuvo en vigor —ello, posiblemente, debido a que para la fecha en que se celebró la vista en su fondo del caso el Tribunal Supremo federal no había resuelto el caso *First Lutheran Church v. Los Angeles County*, ante, decisión donde se reconoce, por primera vez, la "incautación temporal"— *no podemos concluir en este momento, a nivel apelativo, que en este caso se ha configurado una "incautación temporal".* Esta conclusión, en ausencia de la prueba necesaria, es menos lógica aún a la luz de nuestros más recientes pronunciamientos al respecto.

En *Arenas Procesadas, Inc. v. E.L.A.*, ante —citando el *test* o criterio establecido en el caso de *Lucas v. So. Carolina Coastal Council*, ante, por el Tribunal Supremo federal a los efectos de que para que en esta clase de situaciones haya derecho a compensación hay que demostrar que la acción del Estado privó a la propiedad de *todo* uso económico y productivo— señalamos que no se activa el derecho a justa compensación simplemente porque la actuación

---

zonificación o plan de uso de terreno, o porque la Junta de Planificación ha aprobado el desarrollo de un proyecto público sobre dichos terrenos o propiedad." (Énfasis suplido.) 32 L.P.R.A. sec. 2924.

En el Art. 3 de la ley se ofrecen los criterios para determinar si ha habido una "afectación":

"Para determinar la afectación de terrenos se tomarán en consideración los siguientes criterios:

"(a) La reserva de los terrenos no rinde beneficio alguno a los dueños de los terrenos.

"(b) La denegación de todo uso productivo, conforme a la definición de afectación que establecen las secs. 2923 a 2927 [Arts. 1–5] de este título, en un área mayor al veinte por ciento del predio de terreno tomando en consideración la cabida total del predio original.

"(c) La afectación de la propiedad representa limitaciones adicionales para el desarrollo del resto del predio original.

"(d) Las características intrínsecas de los terrenos, tales como condición de inundabilidad, topografía, alta productividad agrícola, capacidad de la infraestructura y zonificación de los mismos, permita [sic] el uso o desarrollo propuesto.

"(e) La naturaleza de la mejora pública que requiere la paralización del uso de terrenos.

"(f) La prioridad de la misma en el programa de mejoras públicas." 32 L.P.R.A. sec. 2925.

del Estado impide el uso óptimo o más productivo de la propiedad afectada. A los mismos efectos, y citando a *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 126–127 (1985), adicionalmente señalamos en *Arenas Procesadas, Inc. v. E.L.A.*, ante, pág. 604, que el Tribunal Supremo federal ha determinado que la denegación de un permiso solicitado por un propietario no constituye una "incautación" si éste no queda impedido de dedicarla a otro uso razonable. *En resumen, bajo la normativa jurisprudencial anteriormente citada, Vencedor viene obligado a probar que la actuación del Estado le privó de todo uso económico y productivo de su propiedad durante el tiempo que ésta perduró*; ello, naturalmente, con el propósito de tener derecho a ser compensado.

Ante esta situación —y atendido el hecho de que el tribunal de instancia al resolver el caso no tuvo el beneficio de la decisión emitida por el Tribunal Supremo federal en el caso *First Lutheran Church v. Los Angeles County*, ante— lo *jurídicamente procedente* es que se devuelva el caso al foro de instancia, *no para una vista sobre los daños enumerados en la opinión minoritaria*, sino para que dicho foro decida, *a la luz de los criterios establecidos por nuestra jurisprudencia y de la prueba que a esos efectos presenten las partes*, si en el presente caso efectivamente hubo, o no, una "incautación temporal" por parte del Estado de los terrenos de Vencedor. Dicho de otra forma, y de manera sencilla, *dicho foro deberá determinar si la acción del Estado privó la propiedad perteneciente a Vencedor de todo uso económico y productivo durante todo el período de tiempo que dichos terrenos estuvieron "congelados"*. De resolverse en la *afirmativa* dicha interrogante, entonces el referido foro de instancia *deberá determinar el justo valor por el uso de la propiedad afectada durante el período de tiempo que duró*

*la referida "incautación temporal".* Véase *First Lutheran Church v. Los Angeles County,* ante, pág. 322.([10])

Ello, a nuestro juicio, constituye el análisis y proceder correcto en derecho. La posición que se asume en la opinión disidente —a los efectos de que "congelación" equivale, automáticamente, a "incautación"— no sólo es una errónea sino que podría tener, y representar, graves y costosas consecuencias para el Estado en casos futuros de esta naturaleza.

## — O —

Opinión concurrente emitida por el Juez Asociado Señor Fuster Berlingeri.

Coincido con lo dispuesto en la sentencia del Tribunal en cuanto a que en este caso debió acumularse a la Junta de Planificación (en adelante Junta) y, por ende, al Estado Libre Asociado como parte indispensable. Fue la Junta quien autorizó la congelación de los terrenos que dio lugar al pleito cuando la referida agencia anticipó que los terrenos habrían de estar destinados para uso público dentro del Plano Regulador para el Área Metropolitana que la Junta estaba formulando. Además, fue la misma Junta quien autorizó finalmente la liberación de los terrenos cuando determinó que éstos ya no tenían utilidad pública. Si bien es cierto que estas actuaciones suyas respondieron en alguna medida a recomendaciones de la Autoridad de Carreteras, la responsabilidad en última instancia por dichas medidas le corresponde propiamente a la Junta, que fue la agencia que las tomó y la única con autoridad para

---

([10]) Los "daños" a los que hace referencia la opinión mayoritaria —esto es, los alegados gastos especiales incurridos por Vencedor como consecuencia de los movimientos de tierra, nuevos planos y el rediseño de las estructuras en que alegadamente tuvo que incurrir— *no constituyen la "justa compensación" a la que un dueño de una propiedad tiene derecho como consecuencia de haberse visto afectada la misma por una "incautación temporal" de parte del Estado.*

hacerlo. En los procesos de planificación del desarrollo urbano del país, la Junta no es un monigote que sigue automáticamente las recomendaciones de otros organismos públicos. Está obligada a ejercer un juicio crítico sobre tales recomendaciones y las decisiones, que finalmente hace, son esencialmente de su propia responsabilidad. Por ello sería improcedente responsabilizar a la Autoridad de Carreteras por los daños que alegadamente puedan haber sido causados por las decisiones de la Junta. Es menester recordar aquí que, aunque la Autoridad de Carreteras es una instrumentalidad pública, sus obligaciones no comprometen necesariamente al Estado Libre Asociado. También debe recordarse que la Autoridad de Carreteras tiene obligaciones financieras con inversionistas privados que no obligan al Estado Libre Asociado. Sería anómalo, pues, que se responsabilizara a la Autoridad de Carreteras por actuaciones que son de la incumbencia del Estado Libre Asociado propiamente. Por esta razón, concurro con el resultado anunciado por el Tribunal en la sentencia de marras.

Ahora bien, es mi criterio que este Tribunal debió haber ido más lejos. Debimos haber resuelto también un segundo asunto que es mucho más importante que el anterior. Ese otro asunto tiene que ver con la cuestión de si la reglamentación pública, a la cual estuvieron sometidos los terrenos en cuestión, constituyó de algún modo una incautación gubernamental que jurídicamente requiere compensación.

Partiendo de los bien conocidos principios de nuestro derecho de propiedad, que preconizan la validez del mecanismo de reserva —por el Estado— de terrenos privados para uso público y que preceptúan que la titularidad sobre una propiedad privada no conlleva el derecho de urbanizarla sin autorización y reglamentación gubernamental, es evidente que la congelación de los terrenos impuesta por la Junta en este caso, obviamente para implementar los aludidos principios de derecho de propiedad, fue un ejercicio legítimo del poder de razón de estado. *E.L.A. v. Rodríguez,*

103 D.P.R. 636 (1975). El hecho de que la Junta al final liberó unos terrenos que antes válidamente había tenido que congelar, no puede dar lugar a que se considere que esta congelación constituyó una incautación compensable. La implicación de ello sería que siempre que la Junta varíe sus criterios de planificación sobre la utilidad pública de determinados terrenos, aunque ello sea por razones válidas y del mayor interés social, quedaría inexorablemente configurada una incautación inválida que hay que compensar según los daños que cause. Tal posición es inaceptable para mí porque limita excesivamente la capacidad de la Junta para realizar sus importantes funciones adecuadamente y porque hace caso omiso de las complejidades del proceso de planificación urbana. Significaría que cualquier cambio en las decisiones pertinentes de la Junta, que respondan a su vez a cambios importantes en las circunstancias físicas, sociales o económicas, muchos de éstos a veces imprevisibles, tendría que considerarse siempre como caprichoso o irrazonable.

Es cierto que en *First Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), el Tribunal Supremo de Estados Unidos, sobre fundamentos constitucionales, resolvió que una incautación es compensable aunque sea temporera. Pero en ese caso la reglamentación gubernamental era presuntamente inválida *desde sus comienzos.* El Tribunal Supremo federal en efecto resolvió que si el Gobierno incurría en una reglamentación ilegal, no podía librarse de su responsabilidad por ello con sólo rescindir dicha reglamentación y que, por lo tanto, tenía que compensar a la parte afectada por el daño causado mientras estuvo en vigor la reglamentación ilegal. Lo dispuso así:

> We merely hold that where government's activities have worked a *taking* of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the *taking* was effective. (Énfasis suplido.) *First Lutheran Church v. Los Angeles County,* supra, pág. 306.

Ahora bien, si la reglamentación inicial no era un *taking*, si no era ilegal, entonces no procede la compensación por el período durante el cual ésta estuvo en vigor. Véase 2 *Treatise on Constitutional Law: Substance and Procedure* Sec. 15.14, págs. 520–521 (2da ed. 1992).

En este caso no cabe duda alguna de que la reglamentación de marras inicialmente era legítima; por lo tanto, según *First Lutheran Church v. Los Angeles County*, supra, mientras estuvo vigente no podía considerarse como una incautación compensable. El hecho de que posteriormente, por cambios necesarios en los planes gubernamentales, los terrenos fuesen descongelados, no puede dar lugar a decidir que la acción de la Junta advino ilegal y que procede la compensación correspondiente. De otro modo se limitaría impropiamente la facultad del Estado para tomar medidas necesarias dirigidas a promover el bienestar general.

Por las razones expuestas, yo confirmaría de una vez la sentencia del tribunal de instancia y desestimaría la demanda de Vencedor Development Corp. por no haber mediado incautación compensable alguna.

— O —

Opinión disidente del Juez Asociado Señor Negrón García, a la cual se une el Juez Presidente Señor Andréu García.

I

El 1ro de mayo de 1977 Vencedor Development Corp. (en adelante Vencedor) presentó en el Tribunal Superior, Sala de Bayamón, una acción civil contra la Autoridad de Carreteras de Puerto Rico (en adelante Autoridad), en la cual reclamaba un millón quinientos mil dólares ($1,500,000) por los daños que alegadamente sufrió al congelársele veinticinco (25) cuerdas de su propiedad como re-

serva para uso público. Posteriormente enmendó su demanda para añadir la causal de expropiación a la inversa y el pago de una justa compensación. La Autoridad negó responsabilidad.

Previo a los trámites de rigor, el tribunal (Hon. José F. Rodríguez Rivera, Juez) optó por ventilar primero la responsabilidad de la Autoridad, posponiendo los daños. Luego de esa vista inicial, declaró sin lugar la demanda. Razonó que la acción de expropiación a la inversa era improcedente, pues al presentarse la demanda los terrenos estaban liberados y, en ausencia de una actuación arbitraria, caprichosa o irrazonable gubernamental, los daños con motivo de la congelación temporal no eran compensables. Resolvió, además, que el mecanismo de congelación para un fin público y su posterior liberación no configuraban una incautación, pues esa facultad era inherente al poder constitucional de expropiación y resultaba menos oneroso para el Estado reservar un terreno sin urbanizar o sin construcción. Descartó que la actuación del Estado conllevara una pérdida económica sustancial o una disminución significativa en el valor del terreno.

Adjudicamos la apelación interpuesta por Vencedor, con el beneficio de una vista oral.([1]) Expongamos los hechos esenciales según la propia sentencia, las estipulaciones, la

---

([1]) En los alegatos se discuten los errores siguientes:

"1. El [t]ribunal erró al resolver que no ha habido ninguna incautación.

"2. El [t]ribunal cometió error al resolver que no habiendo incautación, no debe pagarse la justa compensación.

"3. El [t]ribunal cometió error al resolver que no se ha infringido ningún precepto constitucional, de las Constituciones de Puerto Rico y de los Estados Unidos en su Artículo II, Sección 9 y Enmiendas V y XIV.

"4. El [t]ribunal a quo erró al considerar que el congelar una propiedad inmueble es un poder inherente al poder de expropiación, sin determinar si hay o no derecho a compensación.

"5. Erró el [t]ribunal de instancia al considerar que el presente caso es uno de daños y perjuicios contra la Autoridad de Carreteras, cuando reconoce que hubo congelación y que la misma se hace en virtud del poder inherente de expropiación.

"6. Erró el [t]ribunal al considerar que para que opere la cláusula constitucional de expropiación, el Estado a través de una instrumentalidad con dicho poder, congele una propiedad por tiempo irrazonable, para un fin ilegítimo, o que la actuación haya sido arbitraria, caprichosa o irrazonable.

prueba documental, las deposiciones y una transcripción parcial del testimonio del vicepresidente ejecutivo de Vencedor, Ing. Wilfredo A. Igartúa.

## II

Vencedor proyectaba desarrollar la Urb. El Cortijo (antes conocida como Bayamón Highlands) en sus terrenos clasificados como Distrito Residencial R–1, situados en Bayamón. En 1966 presentó ante la Junta de Planificación (en adelante Junta) el proyecto preliminar de la *primera sección,* a construirse en 87.21 cuerdas. El 3 de abril de 1968 la Junta aprobó los planos de construcción, previo al establecimiento de las facilidades vecinales (Centro Cultural y Biblioteca, parques activos y pasivos, escuela y otras) inherentes a este tipo de desarrollo.

El 16 de enero de 1969 sometió el proyecto preliminar de la *segunda sección* a desarrollarse en otras 64.73 cuerdas. El 5 de febrero de 1970 la Junta, a solicitud de la Autoridad, congeló ocho (8) cuerdas equivalentes a 12.36% de ese total. De la propia Resolución surge que a esa fecha se realizaban estudios "conducentes a la formulación del Plano Regulador para el Area Metropolitana, sector Bayamón", y que esa reserva se hizo siguiendo las recomendaciones de la firma que preparó el diseño preliminar del sistema de Transportación Colectivo Rápido para San Juan, conocido como *Metro de San Juan,* a construirse

"7. El [t]ribunal cometió error en la apreciación de la prueba al considerar que la Junta de Planificación mediante Resolución emitida el 28 de junio de 1974 aprueba los planos de construcción para la segunda sección de la Urb. El Cortijo, condicionados a la congelación de 17 cuerdas.

"8. Erró el [t]ribunal al considerar que el programa de transportación Colectiva Rápida pasó a la jurisdicción del Departamento de Transportación y Obras Públicas en 1973.

"9. El [t]ribunal sentenciador incidió en error de derecho al aplicar la doctrina establecida por este Honorable Tribunal en el caso del E.*L.A. v. Northwestern Const., Inc.*, 103 D.P.R. 377, que resuelve definitivamente que para que prevalezca el derecho de justa compensación tiene por el Estado que haberse incautado (taking) de la propiedad, ya sea por incautación de hecho o por medio de la acción de expropiación forzosa." Alegato en apelación, págs. 6–7.

como obra estatal. Se aprobó preliminarmente el proyecto de esa *segunda sección* y se autorizó la preparación de los planos de construcción por un (1) año. El 23 de febrero de 1972, a petición de Vencedor, se le prorrogó por seis (6) meses el desarrollo preliminar alterno aprobado.

El 28 de junio de 1974 la Junta autorizó los planos finales de la *segunda sección* de la Urb. El Cortijo. Como reserva, excluyó además ciento setenta y siete (177) solares que sumaban la cantidad de diecisiete (17) cuerdas, que estarían también afectadas por el propuesto terminal *Metro de San Juan*. Vencedor no esperaba esta última congelación; les tomó por sorpresa y, distinto a las ocho (8) cuerdas originales, naturalmente afectó el ritmo en el movimiento de tierra, el desarrollo y la construcción. El 9 de julio de 1974 sometió un desarrollo preliminar alterno y rediseñó el proyecto para ajustarlo a las recomendaciones de la Autoridad. Tuvieron que hacer nuevos planos. T.E. parcial, págs. 65–66; ingeniero Igartúa.

Así las cosas, posteriormente el Departamento de Transportación y Obras Públicas —nueva agencia a cargo del *Metro de San Juan*— seleccionó setenta (70) cuerdas de un terreno *distinto* propiedad de la Administración de Terrenos. El 2 de septiembre de 1975 el Secretario de dicho departamento recomendó a la Junta la liberación de las veinticinco (25) cuerdas. Así se hizo el 17 de noviembre de 1976, luego de determinarse que ya no tenían utilidad pública.

Resumiendo, las ocho (8) cuerdas iniciales permanecieron reservadas durante seis (6) años y nueve (9) meses; las restantes diecisiete (17) por dos (2) años y cinco (5) meses. Al ser liberadas, Vencedor había urbanizado todo el terreno disponible, excepto las susodichas cuerdas.

Además, el ilustrado tribunal sentenciador determinó:

3. Al descongelarse las veinticinco cuerdas de terreno la demandante acudió ante ARPE para solicitar el desarrollo preli-

minar de 5.44 cuerdas las cuales fueron aprobadas en el año 1978 para dicha Agencia.

4. Hubo cambios en los planos con la congelación de las [diecisiete] cuerdas para poder balancear los movimientos de tierra y fuera económicamente factible construir grupos de unidades menores. Con este cambio quedó aproximadamente un talud de [cuatro] metros entre lo que se construyó contra el nivel [más bajo *en* los] terrenos de las [veinticinco] cuerdas. Determinaciones de hechos adicionales de 26 de junio de 1984, pág. 2.

## III

*Vencedor* reproduce su postura original sobre los ajustes realizados en los terrenos para conformarlo al plano alterno preparado debido a la congelación. Aduce que desarrollar las 19.56 cuerdas remanentes implicaría rellenarlas a un costo oneroso y prohibitivo. Insiste en que dichos terrenos son inservibles y la acción de la Autoridad constituyó una incautación de su propiedad sin justa compensación. Expone, además, que la interferencia con el derecho de uso a la propiedad fue grande y que debemos resolver que hubo incautación de facto y que procede la acción de expropiación a la inversa. En la alternativa, sostiene que sus daños deben ser compensados.

Apoya también sus pedidos en la tesis de que confió, aceptó y descansó en la buena fe y seriedad de las aseveraciones de las agencias concernidas en cuanto a que los terrenos congelados habrían de ser adquiridos de forma oportuna para ser utilizados en el *Metro de San Juan*. Por tal razón realizó sus obras conforme a las directrices de dichas agencias.([2]) Argumenta que el curso de acción y conducta de la Autoridad, en particular, al incluir todas las veinticinco (25) cuerdas para uso público en el desarrollo

---

([2]) Esgrime la Teoría Equitativa de Confianza (*Equitable Realiance Theory*), cuyos requisitos son "que una parte haya tenido la intención de que la otra confió en su palabra o al menos haya conocido que tendría ese efecto" y "que esa confianza haya ocurrido". (Traducción nuestra.) P.A. Newman, *De Facto Taking*, 39 U. Cin. L. Rev. 773 (1970).

del proyecto *Metro de San Juan,* evidencia que fue desposeída y privada de todos sus usos prácticos y beneficios económicos; hubo una completa incautación de la propiedad. Según su criterio, en las 19.56 cuerdas restantes no puede desarrollarse ninguna otra clase de proyecto que no sea compatible con el proyecto aprobado para el *Metro de San Juan.* Expone repetidas veces que probó que ese remanente "hoy en día no tienen ninguna clase de uso y están fuera del mercado de los hombres" (Alegato del demandante apelante, pág. 9), esto es, se destruyeron todos sus usos económicos y físicos.

Vencedor razona que una acción gubernamental de este tipo —aunque no sea la clásica adquisición del título, ocupación o invasión física, sino producto de una reglamentación gubernamental o de sus instrumentalidades con poder de expropiación forzosa— puede constituir una incautación y, por consiguiente, el ejercicio de facto del poder de expropiación forzosa que da lugar a una justa compensación si se priva completamente al dueño de todos o casi todos sus derechos en la propiedad. Ese deber es independiente del tiempo transcurrido entre la congelación y la descongelación pues, una vez ocasionado el daño, sus derechos constitucionales no pueden limitarse.

Finalmente nos dice que, aun cuando la restricción establecida por reglamentación sea subsiguientemente eliminada, la justa compensación sirve para colocar al propietario en la misma posición monetaria que hubiese ocupado si su propiedad no hubiera sido incautada. Invoca, entre otros, los casos de *Almota Farmers Elevator & Whse. Co. v. U.S.,* 409 U.S. 470, 473–474 (1973); *United States v. Reynolds,* 397 U.S. 14, 16 (1970).[3]

En contra, la Autoridad sostiene que no es responsable. Desde su contestación a la demanda y mediante mociones

---

[3] En la vista oral los abogados de la apelante Vencedor Development Corp. estuvieron un tanto ambivalentes al no precisar cual de las alternativas —daños o justa compensación— escogían.

de desestimación ha postulado que no se acumuló, como parte indispensable, al Estado Libre Asociado no obstante las intervenciones y decisiones de la Junta y del Departamento de Transportación y Obras Públicas. Se funda en que a pesar de que el Plan de Reorganización Núm. 6 de 1971 del Departamento de Transportación y Obras Públicas ubicó a la Autoridad dentro de este departamento, ello no alteró su condición de poseer una personalidad propia, separada e independiente del Estado, con poder para demandar y ser demandada. Como tal, ella no puede ser responsabilizada por las actuaciones de esas otras dos (2) agencias.

Sobre el reclamo de incautación, argumenta: (1) que no congeló las primeras ocho (8) cuerdas; (2) que no puede atribuírsele la tardanza de la Junta en descongelar los terrenos; (3) que independientemente de cuál fue la agencia que solicitó la reserva, el responsable sería únicamente quien implantó la reglamentación (la Junta), y (4) que mientras estuvieron congeladas las diecisiete (17) cuerdas, Vencedor no sufrió daños. Aun cuando la Resolución de la Junta de 5 de febrero de 1970 expone lo contrario, niega enfáticamente que pidiera la reserva de las primeras ocho (8) cuerdas.

## IV

De entrada, resolvemos contra la Autoridad su planteamiento sobre la falta de parte indispensable. En *Olivero v. Autoridad de Carreteras*, 107 D.P.R. 301, 311 (1978), dijimos:

> No puede tampoco aducirse en contra de su ejercicio en el caso ante nos que por no ser parte el Estado la acción resulta inoperante. La demandada en este caso —Autoridad de Carreteras— es "un cuerpo corporativo y político en forma de corporación pública e instrumentalidad gubernamental del Estado Libre Asociado" —9 L.P.R.A. sec. 2002— con poder para "[a]dquirir cualquier propiedad o interés sobre la misma en

cualquier forma legal, incluyendo, sin que implique una limitación, la adquisición mediante compra, bien sea por acuerdo o a través del ejercicio del poder de expropiación forzosa." 9 L.P.R.A. sec. 2004(i). ... Además, la Carta de Derechos limita por igual al Estado y a sus corporaciones públicas. Estas son el Estado tanto como lo es el Gobierno. Señalamos en *C.R.U.V. v. Peña Ubiles*, 95 D.P.R. 311, 316 (1967), en que se trataba, como aquí, de una corporación pública, que ésta está limitada por las disposiciones de la Constitución. Citamos de la opinión concurrente del Juez Douglas en *Thorpe v. Housing Authority*, 386 U.S. 670 (1967), la razón para ello: "Porque estamos tratando con un gobierno, y las actuaciones de un gobierno están siempre circunscritas por la Carta de Derechos y la Enmienda 14". (Énfasis suprimido.)

Cónsono con el Art. 9 de la Ley de la Autoridad de Carreteras y Transportación de Puerto Rico, ésta tiene la facultad para iniciar una expropiación y es ella quien debe pagar el precio justo de la propiedad en cuestión. 9 L.P.R.A. sec. 2009. *Como corolario, el Estado no era parte indispensable en una expropiación a la inversa contra la Autoridad.* Tampoco lo sería en cualquier otra acción remedial —daños por incautación temporal— cuya génesis fuera o estuviera relacionada con el descargo de sus poderes, en particular, el de expropiación.

Todo su argumento sobre parte indispensable se desvanece, pues ¿qué impidió que formulara oportunamente una demanda contra tercero en contra del Estado? Como corporación pública capacitada para demandar, ¿por qué no lo hizo? ¿Es justo que diecisiete (17) años después sometamos a Vencedor a semejante vía crucis procesal? Aclarado este extremo, pasemos a los méritos del caso.

## V

El Art. II, Sec. 9 de nuestra Constitución, L.P.R.A., Tomo 1, ed. 1982, pág. 296, establece que "[n]o se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma prescrita por ley". Por definición clásica, "[l]a

propiedad es el derecho por virtud del cual una cosa pertenece en particular a una persona con exclusión de cualquier otra. La propiedad concede el derecho de gozar y disponer de las cosas sin más limitaciones que las establecidas en las leyes". Art. 280 del Código Civil, 31 L.P.R.A. sec. 1111. En *The Richards Group v. Junta de Planificación*, 108 D.P.R. 23 (1978), reconocimos que, conceptualmente, la "propiedad" no posee un contenido estático; representa una idea que históricamente se ha distinguido por su extraordinaria fluidez. Ese pronunciamiento simplemente revistió el enfoque judicial moderno del derecho de propiedad, muy distante del que conocieron los autores de la Constitución de Estados Unidos. Hoy nadie lo califica de "sagrado", como ocurría con frecuencia en el siglo pasado. *Rivera v. R. Cobián Chinea & Co.*, 69 D.P.R. 672, 676 (1949). Si bien en las sociedades democráticas la propiedad entraña determinados derechos —que viven en competencia contínua con otros intereses privados y públicos de importancia cambiante, y en ocasiones crecientes— la extensión de esos derechos y el grado que tienen que ceder ante otros valores dependen de las circunstancias de cada controversia. *The Richards Group v. Junta de Planificación*, supra, pág. 35.

En distintas ocasiones y vertientes hemos sostenido la validez del mecanismo de reserva para uso público de terrenos. *Arenas Procesadas, Inc. v. E.L.A.*, 132 D.P.R. 593 (1993); *Culebra Enterprises Corp. v. E.L.A.*, 127 D.P.R. 943 (1991); *Pamel Corp. v. E.L.A.*, 124 D.P.R. 853 (1989); *Flamboyán Gardens v. Junta de Planificación*, 103 D.P.R. 884 (1975);[4] *Heftler International, Inc. v. J. de P.*, 99 D.P.R.

---

[4] *Flamboyán Gardens v. Junta de Planificación*, 103 D.P.R. 884 (1975), esbozó unos criterios que sirvieron de guía para determinar la razonabilidad del tiempo de unos terrenos privados congelados, pero rehusamos fijar un período máximo limitante. La Ley Núm. 2 de 29 de enero de 1979 (32 L.P.R.A. sec. 2921) fijó en ocho (8) años el plazo tope durante el cual el Estado puede congelar o reservar una propiedad para fin público. Esa ley comenzaría a regir inmediatamente después de su aprobación, y en aquellos casos de propiedades reservadas o congeladas con anterioridad a su vigencia, los ocho (8) años serían desde su vigencia. Art. 3 (32 L.P.R.A. sec.

467 (1970); *Waymouth Corp. v. Junta de Planificación*, 80 D.P.R. 619 (1958); *Segarra v. Junta de Planificación*, 71 D.P.R. 150 (1950).

El poder constitucional de expropiación del Estado tiene como contraparte la acción de expropiación a la inversa para aquellos casos de ocupación física o de incautación sin previa consignación de justa compensación. En *E.L.A. v. Northwestern Const., Inc.*, 103 D.P.R. 377, 384 (1975) —a la luz de sus circunstancias particulares— resolvimos que había una incautación de hecho como consecuencia de la interferencia con el derecho de propiedad y la disminución en el valor de los terrenos. Se recordará que Northwestern los adquirió y al ir a urbanizarlos encontró que la Autoridad de Fuentes Fluviales había colocado una servidumbre de línea eléctrica. Ante un planteamiento —un tanto confuso— de que no había ocurrido incautación porque la Autoridad entró a los terrenos en virtud de un permiso otorgado por los dueños anteriores, señalamos:

> En el contexto de este caso se puede definir la incautación como cualquier privación o interferencia sustancial en el dominio o el disfrute de una cosa. *Thompson, On Real Property*, Tomo 5A, pág. 679, sec. 2579; *Nichols, op. cit.*, Tomo II, sec. 6.3. *Nichols* la define como:
>
> "Cualquier interferencia sustancial con la propiedad que destruya o disminuya su valor, o por la cual el derecho del dueño a usarla o disfrutarla sea sustancialmente menoscabado o destruido." *E.L.A. v. Northwestern Const., Inc.*, supra, pág. 384.

Vencedor se hace eco de la cita transcrita y sostiene que dicha norma aplica a su causa y que debemos resolver que, igualmente, hubo una incautación de hecho y procede el pago de justa compensación. Veamos.

---

2922).

Notamos que para 1979 los terrenos objeto de este recurso estaban liberados. Más aún, el plazo mayor durante el cual parte del terreno estuvo congelado o reservado fue de seis (6) años. Aunque la jurisprudencia y legislación anteriormente citadas no son directamente aplicables, nos sirven de marco de referencia inicial para determinar si la actuación fue o no arbitraria.

Ciertamente, la determinación crucial, en cuanto a si ocurrió una incautación, se hace caso a caso de acuerdo con los hechos particulares. *Arenas Procesadas, Inc. v. E.L.A.*, supra. También, según apuntamos antes, el derecho de propiedad no conlleva urbanizarla sin la autorización y las condiciones gubernamentales. *The Richards Group v. Junta de Planificación*, supra, pág. 35. No tenemos duda, pues, que la condición impuesta a Vencedor para construir su urbanización (*i.e.*, la congelación de sus veinticinco (25) cuerdas de terreno) *inicialmente* fue un acto legítimo dentro del poder gubernamental o dominio eminente del soberano.

Ahora bien, conforme el trasfondo fáctico particular antes expuesto, el caso presenta la peculiaridad de que la congelación fue *temporal*, pues la Autoridad desistió finalmente.

> ... [A]unque el efecto de la privación sea temporero, al amparo de la Constitución de Estados Unidos se ha reconocido que procede una compensación por el tiempo en que el Estado privó al dueño de *todos* los usos productivos en su propiedad. *First Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987). En *Culebra Enterprises Corp. v. E.L.A.*, supra, y en *Pamel Corp. v. E.L.A.*, 124 D.P.R. 853 (1989), reconocimos la aplicabilidad de la doctrina de incautación temporera y, además, concluimos que el término prescriptivo aplicable a los casos de congelación de terrenos para uso público bajo la Ley Núm. 2 de 29 de enero de 1979 (32 L.P.R.A. sec. 2923 *et seq.*), comienza a decursar desde que se libera la propiedad de las restricciones. (Escolio omitido y énfasis en el original.) *Arenas Procesadas, Inc. v. E.L.A.*, supra, pág. 607.

Esa normativa nos obliga a repasar someramente la decisión más reciente de la Corte Suprema federal sobre este extremo, *Lucas v. So. Carolina Coastal Council*, 505 U.S. 1003 (1992). Allí, Lucas había comprado en 1986 dos (2) predios residenciales en la isla de Palms, Condado de Charleston, Carolina del Sur, para construir unas casas. En 1988 la Legislatura estatal promulgó una ley que tuvo

el efecto directo de prohibirle que construyera toda estructura permanente habitable. Lucas planteó en las cortes del estado que ello constituía una incautación sin compensación inconstitucional. A la postre, su planteamiento arribó a la Corte Suprema federal, la cual hizo una relación de la evolución doctrinaria en este campo y varios pronunciamientos de importancia. Expongámoslos.

La Corte opinó que *antes* de *Pennsylvania Coal v. Mahon*, 260 U.S. 393 (1922), se pensaba generalmente que la Cláusula de Justa Compensación alcanzaba sólo la apropiación *directa* de la propiedad o el equivalente funcional de un desposeimiento. Luego, ese enfoque experimentó un cambio a "si la reglamentación va demasiado lejos, se reconocerá una incautación". (Traducción nuestra.) *Pennsylvania Coal v. Mahon*, supra, pág. 415. Se trata de una determinación caso a caso. Con el devenir del tiempo, nos dice la Corte, se reconocieron dos (2) categorías de acción reglamentaria compensables, sin cuestionamiento específico del interés público invocado. La primera, aquellas reglamentaciones que imponen una invasión física; la segunda, cuando la reglamentación niega *todo* uso productivo. *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987).

La Corte recordó que a partir de *Agins v. Tiburon*, 447 U.S. 255 (1980), se infringe la Quinta Enmienda si la reglamentación no adelanta un interés estatal legítimo o niega al dueño un uso económico viable de su tierra. La razón de decidir es que la total privación del uso benéfico, desde el punto de vista del dueño, equivale a una expropiación física. La base funcional para que el Estado pueda de forma legítima y reglamentaria afectar valores de una propiedad sin compensación es que sería difícil funcionar si "algunos valores incidentales" a la propiedad no pudieran ser disminuidos sin compensación cada vez que cambie la ley general. La Corte estimó que esta norma no aplicaba a

las situaciones relativamente raras en las cuales se prive al dueño de todo uso económico de su propiedad.

Además, la Corte Suprema reconoció que el requisito de compensación respondía al hecho de que una reglamentación que deja al dueño sin opciones productivas o benéficas para su uso, por requerirle que su propiedad quede sustancialmente en su estado natural, implica el alto riesgo de imponerle cierto tipo de servicio público bajo la excusa de mitigar algún daño público serio. Cuando ese balance de intereses se rompe, perjudicando al dueño, "[p]ensamos que existen buenas razones para nuestra reiterada creencia de que si el dueño de la propiedad inmueble es llamado a sacrificar todos los usos económicos beneficiosos a nombre del bienestar común, esto es, dejar su propiedad económicamente inerte, ha sufrido una incautación". (Traducción nuestra.) *Lucas v. South Carolina Coastal Council,* supra, pág. 1019. No obstante, el más Alto Foro federal aclaró que esta regla tenía excepciones en situaciones en las cuales el Estado podía demostrar que el uso prohibido no era parte inicial del título del dueño. *Cualquier reglamentación que vede todo uso económicamente genérico conllevará una compensación, salvo que la prohibición sea inherente al título de la propiedad misma.* Es decir, las restricciones tienen que surgir de los principios de la ley de propiedad y los estorbos impuestos en la jurisdicción al derecho de propiedad. Las reglamentaciones pueden tener el efecto de eliminar el único uso productivo de la tierra, pero no prohibir aquel uso productivo previamente permitido bajo los principios pertinentes de las leyes de estorbos y propiedad.

Más adelante, el Tribunal expresó que *Agins v. Tiburon,* supra, decidió que procede la determinación de que ocurre una incautación reglamentaria, que conlleva compensación, si "la reglamentación cuestionada no avanza sustancialmente un interés legítimo gubernamental o le niega al

dueño un uso económicamente viable". En *First Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), se ratificó la posibilidad de una incautación reglamentaria, según reconocido desde *Pennsylvania Coal v. Mahon*, supra, y que, de ocurrir, era tan compensable como la incautación física. Además, en el contexto de expropiación a la inversa, estableció la existencia de la incautación temporera. Es decir, si se determina que la aplicación de una reglamentación equivale a una incautación, de ésta no ser permanente, se tiene que compensar por el tiempo que fue efectiva. *Al respecto, la sola invalidación o eliminación de la reglamentación, sin compensación por el uso de la propiedad durante el tiempo de su vigencia, no es un remedio suficiente. First Lutheran Church v. Los Angeles County*, supra, pág. 319.

En *Nollan v. California Coastal Comm'n*, supra, se avaló el razonamiento de que si el medio gubernamental elegido no es razonable, es decir, que no adelanta la justificación final del medio —la falta de nexo entre la reglamentación y su propósito original hacen que la reglamentación no adelante sustancialmente el interés deseado— debe compensarse.

Finalmente, *Lucas v. So. Carolina Coastal Comm'n*, supra, incorporó a *Agins v. Tiburon*, supra, a *First Lutheran Church v. Los Angeles County*, supra, y a *Nollan v. California Coastal Comm'n*, supra, aunque modificó a *Agins v. Tiburon*, supra, en lo relativo a la segunda parte de la encuesta judicial: *ahora, la privación tiene que ser de todo uso económicamente benéfico de la propiedad.* La Corte explicó así la excepción a la compensación aun cuando de acuerdo con los mencionados casos, incluso *Lucas v. So. Carolina Coastal Council*, supra, procediera: si la actividad prohibida no era parte del derecho del dueño cuando éste advino titular, sea debido a las leyes sobre propiedad existentes en la jurisdicción o por los principios de estorbos.

# VI

No podemos ignorar estos importantes pronunciamientos y su impacto sobre nuestro acervo jurisprudencial. Apliquémoslos.

La utilidad pública y la necesidad del fin que perseguía la actuación de la Autoridad —sistema rápido de transportación colectiva— fue admitida por Vencedor. De hecho, su contención siempre ha sido que confió, aceptó y descansó en la buena fe y seriedad de esa determinación, y a tal efecto rediseñó y adaptó sus planos de desarrollo. Es la variación de la determinación gubernamental, la que caracteriza como arbitraria, caprichosa e irrazonable.

Si como consecuencia de la congelación temporal los terrenos *están inservibles* y ha habido una interferencia sustancial con los derechos propietarios de Vencedor, es cuestión de prueba.[5] Ella en todo momento ha argumentado que sometió a la Autoridad de Reglamentos y Permisos

---

[5] Con posterioridad a estos hechos, en 26 de junio de 1987 se aprobó la Ley Núm. 46 (32 L.P.R.A. secs. 2923–2927), que derogó la Ley Núm. 2 de enero de 1979. Pretende "adoptar unas normas uniformes y consistentes en cualquier determinación sobre la asignación de costos y beneficios, especialmente aquellas relativas a los criterios y términos utilizados para determinar cuándo los costos al propietario trascienden los beneficios a la sociedad". 32 L.P.R.A. sec. 2923. También, "establecer una distinción entre los conceptos afectación, dedicación y reserva para facilitar la interpretación de los mismos y lograr la eficaz aplicación de las secs. 2923 a 2927 de este título". Íd.

La determinación de afectación, según consta en en el Art. 2 de la Ley Núm. 46, *supra*, 32 L.P.R.A. sec. 2924(1), significa la denegación de todo uso productivo, lo que equivale a privar al terreno de todo uso económicamente benéfico. La presencia de uno solo no es concluyente de que el terreno ha sido afectado; es menester el balance de todos.

A estos criterios tenemos que añadir los visualizados por la Corte Suprema federal en *Lucas v. So. Carolina Coastal Council*, 505 U.S. 1003 (1992): el grado de daños a las tierras públicas y a los recursos o propiedades adyacentes; el valor social de la actividad del reclamante y su conveniencia en la localidad en cuestión, y los casos relativos en los cuales el daño alegado puede ser evitado a través de medidas alternas que lógicamente pueda adoptar el Gobierno y el reclamante.

El hecho de que un uso particular ha sido seguido por dueños similarmente situados, de ordinario significa que no hay prohibición de derecho común alguna sobre la actividad vedada; también, el que a otros dueños igualmente situados se les haya permitido continuar el uso negado al reclamante.

(A.R.Pe.) unos planos para desarrollar las veinticinco (25) cuerdas objeto de este litigio. No obstante, en autos no hay ni consta documento alguno que avale tal hecho. Sólo surge que Vencedor presentó un plano para desarrollar 5.5197 cuerdas, de las cuales le aprobaron 5.44. La única carta del ingeniero Igartúa en autos (Documento Núm. 2, estipulado) expone que se han "sometido planos *parciales* para desarrollar *esas* 25 cuerdas" —(énfasis suplido) Alegato del apelante, Apéndice T, pág. 1— expresión ambigua, que es compatible con la Resolución de A.R.Pe. de 6 de junio de 1978 para aprobar el "Plano de aprobación *parcial*", correspondiente a 5.5197 cuerdas. Cualesquiera dudas al respecto quedan disipadas mediante una simple ojeada al primer folio del plano sometido (*Exhibit* 29) *en esa ocasión,* lo cual confirma que fue *parcial* y no de todo el remanente de las veinticinco (25) cuerdas.

En resumen, Vencedor no ha podido demostrar su alegación de que esos terrenos "no tienen ninguna clase de uso y están fuera del mercado de los inmuebles". Según indicamos, la prueba al respecto fue extremadamente débil. *A la luz de todas esas circunstancias, no procede la acción de expropiación a la inversa.*

Ahora bien, distinta solución se impone por el hecho no contradicho que ocho (8) cuerdas permanecieron seis (6) años y nueve (9) meses reservadas, y las restantes diecisiete (17) por dos años y cinco (5) meses. Esa congelación así *combinada* afectó y obligó a Vencedor a introducir unos cambios sustanciales en los movimientos de tierra; someter nuevos planos; rediseñar estructuras y otros. Tales modificaciones no fueron cambios rutinarios para ajustarlos a los reglamentos y a las leyes existentes, sino extraordinarios y poco usuales, resultado directo de la congelación de unos terrenos clasificados como R-1. Estamos convencidos de que, de acuerdo con los parámetros constitucionales y

legales prevalecientes, las peculiaridades de este caso configuran una *incautación temporal* que exije compensación.

Revocaríamos, ordenando al Tribunal Superior, Sala de Bayamón, que sin necesidad de acumular como parte al Estado Libre Asociado, previa vista evidenciaria, determinara la compensación que le corresponde a Vencedor diecisiete (17) años después.